

DA 06-0436

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 205

HENRY KRUZICH,

       Petitioner and Appellee,

v.

OLD REPUBLIC INSURANCE COMPANY,

    Respondent/Insurer and Appellant.

APPEAL FROM:    Montana Workers' Compensation Court, WCC No. 2005-1247
                Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Joe C. Maynard, Steven W. Jennings, Crowley, Haughey, Hanson, Toole
              & Dietrich, P.L.L.P., Billings, Montana

       For Appellee:

              William P. Joyce, Joyce, Johnston & MacDonald, PLLP, Butte, Montana

Submitted on Briefs:  January 24, 2007

Decided:  June 10, 2008

Filed:

_____
                         Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Old Republic Insurance Company (Old Republic) appeals a judgment of the Workers' Compensation Court (WCC) setting aside the 1994 settlement agreement between Old Republic and Henry Kruzich, and reopening Henry's claim.  We reverse.

¶2     We address the following issue on appeal:  Did the WCC err in rescinding the settlement agreement based upon mutual mistake of fact?

**Factual and Procedural Background**

¶3     In August 1988, Henry suffered a serious head injury while employed with Blue Range Mining of Butte, when an ore bucket struck Henry on the side of the face.  At the time of Henry's injury, Blue Range Mining was enrolled under Compensation Plan No. 2 of the Workers' Compensation Act (WCA), and was insured by Old Republic.

¶4     The blow to Henry's head caused a cave-in to the right orbital rim with the orbital floor and left lateral orbit being pushed up into the frontal lobe of his brain.  He underwent surgery to repair and reconstruct his fractured skull.  Henry was 37 years old at the time of the accident.  He and his wife Kathy had been married for five years and had two small children.

¶5     Shortly after the accident, Old Republic accepted liability for Henry's injury and began paying temporary total disability and medical benefits.  Old Republic retained the services of Industrial Injury Claims Services (Industrial) to adjust the claim.  While the extent of Henry's disability was initially unclear, the parties ultimately agreed that Henry was permanently totally disabled.

2

¶6     In March 1990, Henry traveled to the Virginia Mason Clinic in Seattle for additional testing to determine the extent of his brain injury. These tests revealed that Henry had reductions in speed and flexibility of thinking, and in fine motor speed and grip strength in his right hand; significant problems with visual spatial memory and with complex tactual spatial problem solving; and a tendency to lose complex visual spatial information. The clinic also noted that Henry suffered from constant headaches.

¶7     In February 1991 and over the next two years, Henry's doctors suggested that Henry needed a minimum of eight to ten hours of domiciliary care daily and that, in all likelihood, he required 24-hours-a-day domiciliary care. The doctors opined that without such care, Henry was at a significant risk for additional injuries, continued depression, and possible suicide. While Henry could bathe and dress himself, Kathy explained that Henry engaged in unsafe behaviors when he was unsupervised, such as forgetting to turn off stove burners or leaving the door to the wood stove open.

¶8     Since the accident, Kathy had operated a small day care out of her home which also provided her the opportunity to supervise Henry. In October 1991, Kathy closed her day care to take employment outside the home in order to obtain health insurance coverage for her family. Neighbors and family members checked in on Henry during the day, but he struggled to function on his own. Henry's doctors believed that Henry required more structure, hence Kathy quit her job to stay home and care for Henry.

¶9     Kathy was appointed as Henry's conservator on June 9, 1992. After months of negotiations, the parties reached an agreement that required Old Republic to pay Kathy

$5.30 per hour, 70 hours per week, for her to stay home and care for Henry. Old Republic began paying for this domiciliary care in January 1993 at the agreed upon rate.

¶10 In June 1994, Henry and Old Republic entered into a Compromise and Settlement Agreement, which was approved by the Department of Labor and Industry on July 26, 1994. Under the terms of this agreement, Henry's claims for permanent total disability benefits and domiciliary care benefits were settled for $132,701.28 (of which $125,000.00 represented new money and $7,701.28 represented the waiver of an overpayment). In conformance with the parties' agreement, an exhibit was attached to the settlement agreement which expressly closed "fully and forever . . . any and all present and future domiciliary care" benefits while specifically reserving medical and hospital benefits. To that end the exhibit provided:

> Such benefits shall include all costs and charges associated with any type of supervised care that claimant may need or desires as a result of his industrial injury including, but not limited to, domiciliary (attendant) care as presently provided by claimant's wife and paid for by the Insurer, rest home care, rehabilitation center or attended care (and its equivalent), and paid supervision of daily activities in or outside of the home. In closing out all domiciliary care medical benefits, the parties agree that all other medical care benefits for medical conditions caused by the industrial injury shall remain in force.

¶11 In December 1995, Henry no longer required domiciliary care, hence Kathy was able to return to work outside the home. As before, their neighbors checked on Henry from time to time.

¶12 In 2004, Henry began to exhibit symptoms of a movement disorder. His doctors variously described his condition as Parkinsonism, Parkinson's disease, and Parkinson's-

4

plus. It was determined that the Parkinson's disease was most likely the result of the traumatic brain injury sixteen years earlier.

¶13 On February 17, 2005, Henry filed a petition with the WCC seeking to rescind the settlement agreement. Henry argued that the parties' failure to anticipate that he would ultimately contract Parkinson's disease as a result of his injury was a mutual mistake of fact justifying rescission of the settlement agreement.

¶14 A hearing was held in the matter on January 23, 2006. On June 1, 2006, the WCC entered its Findings of Fact, Conclusions of Law and Judgment wherein it determined that because a mutual mistake of fact regarding the nature of Henry's injuries had occurred, the settlement agreement must be set aside and Henry's claim reopened.

¶15 Old Republic appeals.

**Standard of Review**

¶16 We conduct de novo review of the WCC's conclusions of law to determine whether the court's conclusions are correct. *Harrison v. Liberty Northwest Ins. Corp.*, 2008 MT 102, ¶ 11, 342 Mont. 326, ¶ 11, 181 P.3d 590, ¶ 11 (citing *Flynn v. Uninsured Employers' Fund*, 2005 MT 269, ¶ 11, 329 Mont. 122, ¶ 11, 122 P.3d 1216, ¶ 11).

¶17 Our review of the WCC's findings of fact, on the other hand, is both deferential and limited in scope. We simply review the WCC's factual findings to determine whether they are supported by substantial credible evidence. *Harrison*, ¶ 11 (citing *In re Abfalder*, 2003 MT 180, ¶ 10, 316 Mont. 415, ¶ 10, 75 P.3d 1246, ¶ 10). Substantial credible evidence is that which a reasonable mind could accept as adequate to support a conclusion. *Harrison*, ¶ 11 (citing *Simms v. State Compensation Ins. Fund*, 2005 MT

5

175, ¶ 11, 327 Mont. 511, ¶ 11, 116 P.3d 773, ¶ 11). Because of the high level of deference we accord to the WCC's factual findings, we will consider evidence to be substantial even if it is contradicted by other evidence, it is somewhat less than a preponderance and it is inherently weak. However, it must be more than a mere "scintilla" of evidence and it must rise above the level of "trifling or frivolous." *Harrison*, ¶ 11 (citing *EBI/Orion Group v. State Compensation Mut. Ins. Fund*, 249 Mont. 449, 453, 816 P.2d 1070, 1073 (1991)).

¶18 As for the scope of our review, we confine our review to determining whether substantial credible evidence supports the findings actually made by the WCC. We do not resolve conflicts in the evidence, and we do not consider whether evidence supports findings that are different from those made by the WCC. *Harrison*, ¶ 11 (citing *Kloepfer v. Lumbermen's Mut. Cas. Co.*, 276 Mont. 495, 498-99, 916 P.2d 1310, 1312 (1996); *Montana State Fund v. Murray*, 2005 MT 97, ¶ 19, 326 Mont. 516, ¶ 19, 111 P.3d 210, ¶ 19).

**Discussion**

¶19 *Did the WCC err in rescinding the settlement agreement based upon mutual mistake of fact?*

¶20 Old Republic argues that the WCC erred in concluding that the parties' made a material and mutual mistake when they failed to predict that Henry would contract Parkinson's disease several years after the settlement. Old Republic provides the following four reasons for its contention. First, Old Republic asserts that the mutual mistake-of-fact doctrine rejects the notion that a mistake of fact can consist of a failure to

6

predict future events. Second, Old Republic asserts that even accepting the WCC's conclusion that a failure to anticipate future events can be a mistake, such failure in this case is not a mutual mistake because, at the time of settlement, Old Republic was aware that Henry's condition would worsen over time. Third, Old Republic asserts that even assuming that the parties' failure to predict Parkinson's disease was a mutual mistake, the WCC erred by concluding that the mistake was material. Finally, Old Republic asserts that in concluding that the parties' failure to predict the future was a mutual mistake of fact, the WCC erred by setting forth a rule that jeopardizes the enforceability of settlement agreements, thereby disregarding the public policy of encouraging settlements.

¶21     Henry argues, on the other hand, that at the time of the settlement, his condition was stable and he had no problems with motor function. Thus, neither Henry, his wife, nor Old Republic's adjuster knew that Henry would develop a movement disorder. On that basis, Henry argues that the WCC correctly relied on the long standing rule that a mistake about the nature and extent of the claimant's physical condition is a "material" mistake of fact justifying the rescission of the settlement agreement.

¶22     Henry fails to recognize, however, that it is precisely because his condition was stable and he had no problems with motor function at the time he entered into the settlement agreement that a mutual mistake did not occur. It is on this basis that we reverse the WCC. While substantial credible evidence does support the WCC's finding that Henry's Parkinson's disease was caused by his 1988 injury, it is undisputed that the Parkinson's disease did not exist when the parties entered into their settlement agreement.

7

¶23 This Court has adopted the widely accepted rule that a failure to predict the future is not a mistake of fact as contemplated by the mutual mistake-of-fact doctrine. *See Gamble v. Sears*, 2007 MT 131, ¶ 46, 337 Mont. 354, ¶ 46, 160 P.3d 537, ¶ 46 ("it is undisputed that if Gamble's odontoid fracture *existed at the time of settlement*, the parties were mutually mistaken regarding a material fact, and the settlement agreement must therefore be rescinded." (emphasis added)). Thus, the parties' failure to predict Henry's Parkinson's disease was not a mutual mistake of fact.

¶24 Because a settlement agreement is a contract, we apply contract law to determine whether the agreement is valid and enforceable. *Gamble,* ¶ 24 (citing *Wolfe v. Webb*, 251 Mont. 217, 223, 824 P.2d 240, 244 (1992)). The parties must give their consent to enter into a contract and that consent must be given freely. However, consent cannot be given freely when it is based on a mistake. *Gamble*, ¶ 25.

¶25 "Either a mistake of fact or a mistake of law will preclude freely given consent." *Gamble*, ¶ 25. Section 28-2-409, MCA, defines what constitutes a mistake of fact:

> Mistake of fact is a mistake not caused by the neglect of a legal duty on the part of the person making the mistake and consisting in:
> (1) an unconscious ignorance or forgetfulness of a fact, *past or present*, material to the contract; or
> (2) belief in the *present* existence of a thing material to the contract which does not exist or in the *past* existence of such a thing which has not existed. [Emphasis added.]

Thus, as Old Republic points out, parties to a contract make a mutual mistake of fact only if they are unconsciously ignorant or forgetful of a fact that existed *prior to or at the time of* settlement. Ignorance of a future event does not amount to a mistake of fact.

8

¶26 Henry notes in his brief on appeal, that while the parties agree that the movement disorder was caused by Henry's 1988 injury, "[t]he parties also agree that *prior to and at the time of settlement* neither knew that there was any connection between head injuries and Parkinson's and neither expected [Henry] would develop such a condition. (emphasis added)." That is precisely the point.

¶27 "[T]he erroneous belief must relate to the facts *as they exist at the time of the making of the contract*. A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined here." *Restatement (Second) of Contracts* § 151 cmt. a (1981) (emphasis added). "[I]n order to relieve a party from liability on the contract, the mistake must relate to a material fact, *past or present*, and not to a future contingency." 17A C.J.S. *Contracts* § 149a (1999) (emphasis added).

> Mutual mistake results when both parties to a contract share a common assumption about a vital *existing* fact upon which they based their bargain and that assumption is false, and because of the mistake, a quite different exchange of values occurs from the exchange of values the parties contemplated. . . . [A] mutual mistake of fact cannot lie against a *future* event. Mutual mistakes must concern past or present facts, *not unexpected facts that occur after the document is executed*."

17A Am. Jur. 2d *Contracts* § 202 (2004) (emphasis added).

¶28 In *United States v. Southwestern Elec. Co-op., Inc.*, 869 F.2d 310, 314 (7th Cir. 1989), the United States Court of Appeals for the Seventh Circuit stated that the doctrine of mutual mistake does not cover an erroneous "prediction or judgment as to events to occur in the future . . . it must be a mistake of a present or a past fact." The Court of Appeals further stated that "the rules governing rescission for either mutual or singular

9

mistake are inapplicable where . . . a party's erroneous prediction or judgment as to future events is involved." *Southwestern*, 869 F.2d at 315 (citing *Restatement (Second) of Contracts* § 151 cmt. a).

¶29 Similarly, the United States Court of Appeals for the Third Circuit cited with approval two prior Pennsylvania cases that held that "a party who underestimates the future severity of her injuries will not be permitted to avoid the consequences of a settlement agreement based on mutual mistake." *Consolidated Rail Corp. v. Portlight, Inc.*, 188 F.3d 93, 97 (3rd Cir. 1999) (citing *Emery v. Mackiewicz*, 240 A.2d 68 (Pa. 1968); *Leyda v. Norelli*, 564 A.2d 244 (Pa. Super. 1989)). The Court of Appeals determined that this rule was

> entirely consistent with the more general principle of mutual mistake doctrine that erroneous predictions of future events do not qualify as a mistake. . . . Were there not such a rule, the effectiveness of settlement agreements would be greatly diminished.

*Consolidated*, 188 F.3d at 97.

¶30 Numerous other jurisdictions have held the same. For example, the Supreme Court of West Virginia held that

> a contract may not be reformed or rescinded based upon a mutual mistake of fact if the mistake relates to a mistaken belief, judgment, or expectation as to future, rather than past or present, facts, occurrences or events. If a party to a contract could reform or rescind a contract on the ground that an expectation as to future results or occurrences was mistaken, the stability and binding force of many contracts would be destroyed.

*Ryan v. Ryan*, 640 S.E.2d 64, 69 (W. Va. 2006). The court in *Ryan* quoted with favor the following excerpt from a decision of the United States Court of Appeals for the Fourth Circuit:

In determining whether there has been a mutual mistake of fact, we must examine the facts *as they existed at the time of the agreement* . . . . A mutual mistake in prophecy or opinion may not be taken as a ground for rescission where such mistake becomes evident through the passage of time. What is today only a conjecture, an opinion, or a guess, might by tomorrow, through the exercise of hindsight, be regarded then as an absolute fact.

*Ryan*, 640 S.E.2d at 69 (emphasis added) (quoting *United States v. Garland*, 122 F.2d

118, 122 (4th Cir. 1941), *cert denied*, 314 U.S. 685, 62 S. Ct. 189 (1941)).[1]

---

[1] In addition to the Seventh Circuit Court of Appeals' decision in *Southwestern*, the *Ryan* court also cited to the following cases in support of its position that the facts forming the alleged mutual mistake must have existed at the time of the agreement:

> *Baker v. Penn Mut. Life Ins. Co.,* 788 F.2d 650, 661 (10th Cir. 1986) ("at the time the parties entered into the 1975 Contract, the result of plaintiff's future performance under the contract could only have been mere conjecture, not an existing fact. No claim of mutual mistake can be stated on such a basis.") (footnote omitted); *Shear v. National Rifle Ass'n of America,* 606 F.2d 1251, 1260 (D.C. Cir. 1979) ("The mistake does not apply to predictions or promises of future conduct."); *Hartford Fire Ins. v. Federated Dept. Stores,* 723 F.Supp. 976, 994 (S.D.N.Y. 1989) (noting that erroneous predictions are not mistakes that allow rescission.); *Haas v. Pittsburgh Nat. Bank,* 495 F.Supp. 815, 818-19 (W.D. Pa. 1980) ("The court is confronted here, at best, with a risk that resulted from the inability of the parties to predict future events. As the Restatement and other authorities make clear, such risks are distinct from bona fide mutual mistakes of fact and provide no basis for reformation of a contract."); *Boles v. Blackstock,* 484 So. 2d 1077, 1082 (Ala. 1986) ("as a matter of law, reliance on a prediction as to future events, will not support a claim for rescission or release based on a claim of mutual mistake of fact"); *In re Marriage of Hall,* 681 P.2d 543, 545 (Colo. App. 1984) ("A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' for the purpose of making a contract voidable."); *Beals v. Tri-B Associates,* 644 P.2d 78, 80 (Colo. App. 1982) ("the parties in this case did not make the type of mistake which would justify rescission . . . If the parties harbor only mistaken expectations as to the course of future events . . . rescission is not proper.") (internal citations omitted); *Highway and Transp. Dept. v. Garley,* 111 N.M. 383, 806 P.2d 32, 36 (1991) (finding an erroneous prediction of the future is not a mistake under the doctrine of mutual mistake); *Opsahl v. Pinehurst,*

¶31    In the case *sub judice*, Henry cites to several Montana cases which he contends illustrate that his development of Parkinson's disease sixteen years after his accident was a mutual mistake of fact requiring rescission of the settlement agreement. However, the cases Henry cites, *Kienas v. Peterson*, 191 Mont. 325, 624 P.2d 1 (1980); *Weldele v. Medley Development*, 227 Mont. 257, 738 P.2d 1281 (1987); *Kimes v. Charlies Fam. Din. & Donut Shop*, 233 Mont. 175, 759 P.2d 986 (1988); *Wolfe v. Webb*, 251 Mont. 217, 824 P.2d 240 (1992); and *South v. Transportation Ins. Co.*, 275 Mont. 397, 913 P.2d 233 (1996), are fatal to Henry's argument because they clearly establish that a failure to predict a future condition is not a mistake regarding the nature and extent of a claimant's injury.

¶32    In *Kienas*, the claimant sustained a back injury in an industrial accident for which he received compensation benefits from the State Fund. After nine months of receiving benefits, the claimant signed a settlement agreement with the State Fund. Eighteen months later, however, the claimant filed a petition in the WCC for a hearing to reopen his file and to set aside the settlement agreement. At the time of the accident, the claimant was suffering from cerebral palsy. He argued that the accident aggravated this

---

*Inc.*, 81 N.C.App. 56, 344 S.E.2d 68, 72 (1986) (The court reasoned that, to justify rescission of the contract for mutual mistake, the mistake must have concerned facts as they existed when the contract was made.); *Jackson County v. Jackson Educ. Serv. D.*, 90 Or. App. 299, 752 P.2d 1224, 1228 (1988)*, review denied* 306 Or. 155, 758 P.2d 346 (1988) ("Each side might have fervently hoped that the legislation would or would not result, but that hope is not a fact upon which a contract may be found to be invalid.").

*Ryan,* 640 S.E.2d at 68-69.

pre-existing condition and that the settlement did not take this factor into account. The WCC denied claimant's petition. *Kienas*, 191 Mont. at 326-28, 624 P.2d at 1-2. This Court reversed on the basis of a mutual mistake of material fact. However, contrary to Henry's assertions in the instant case, the mutual mistake of fact found by this Court in *Kienas* was the parties' ignorance of the fact that the claimant's workplace accident could have aggravated his *pre-existing* cerebral palsy—a condition that existed and of which the parties were aware at the time they entered into the settlement agreement. *Kienas*, 191 Mont. at 329-30, 624 P.2d at 3.

¶33    Similarly, in *Weldele*, the claimant was initially diagnosed with carpal tunnel syndrome and rotator cuff syndrome. While thoracic outlet syndrome[2] was suspected by the two treating physicians, both failed to verify that condition and dismissed it as a diagnosis. After settlement, the claimant's shoulder and neck pain continued and he was ultimately diagnosed with thoracic outlet syndrome requiring further surgery. *Weldele*, 227 Mont. at 257-60, 738 P.2d at 1281-83. On appeal, this Court affirmed the WCC's decision to rescind the agreement based upon mutual mistake of fact. This Court found that the claimant had thoracic outlet syndrome *at the time of the settlement*. *Weldele*, 227 Mont. at 260-61, 738 P.2d at 1283.

¶34    In *Kimes*, the claimant injured his knee when he fell down some steps at work. He underwent surgery to repair a ruptured cruciate ligament in his knee. Following surgery,

---

[2]    Unlike carpal tunnel syndrome, which is a compression of a nerve in the wrist, or rotator cuff syndrome, which is an inflammation of the shoulder tendons, thoracic outlet syndrome is a compression of, or pressure on, certain nerves or arteries in the chest around the collarbone, which can have serious effects on the shoulders, arms and hands of the afflicted.

13

the parties entered into a settlement agreement. The claimant continued to have knee problems and further diagnostics revealed that, in addition to rupturing his cruciate ligament, the claimant had torn a cartilage in his knee during his fall which the original treating physician had failed to detect. *Kimes*, 233 Mont. at 176-77, 759 P.2d at 987. This Court agreed with the WCC's decision to set aside the settlement agreement on the basis that both parties were ignorant of an injury *that actually existed at the time of settlement*. *Kimes*, 233 Mont. at 178, 759 P.2d at 988.

¶35 In *Wolfe*, the claimant was injured when the ditch in which he was installing pipe caved in and buried him up to his neck. As a result of this accident, he sustained crushing injuries across his upper body, including a fracture of his left clavicle and dislocation of his right clavicle where it formed a joint with the sternum. He also reported pain in his shoulders. Claimant underwent two surgeries to his clavicle, but because the pain in his shoulder was not his primary complaint, no treatment for his shoulder was rendered at that time. *Wolfe*, 251 Mont. at 220, 824 P.2d at 241-42.

¶36 Three years after his injury, the claimant in *Wolfe* entered into a settlement agreement with the State Fund. However, he continued to experience problems with his shoulder. He returned to his treating physician who discovered a defect in the shoulder joint. Thereafter, the claimant underwent two surgeries on his shoulder. He petitioned the WCC to reopen his case and the WCC agreed concluding that there had been a mutual mistake of material fact sufficient to justify setting aside the settlement agreement. *Wolfe*, 251 Mont. at 221-22, 824 P.2d at 242-43. On appeal, we stated that "[o]ur review then is necessarily limited to whether the testimony of one qualified and credible witness

14

established that claimant's [shoulder] was injured *at the time of his settlement agreement with appellant.*" *Wolfe*, 251 Mont at 230, 824 P.2d at 248 (emphasis added).

¶37 And, in *South*, the claimant sustained an on-the-job injury to her back. Following two separate back surgeries, she settled her claim. The settlement agreement listed several jobs which had been approved by the claimant's doctor and which the parties believed the claimant could perform. In accordance with the terms of the agreement, the claimant elected to begin training as a massage therapist, one of the approved jobs listed in the agreement. While in training, she began to experience worsening back pain hence she was forced to quit the training program and undergo additional surgery. The WCC denied the claimant's request to rescind the settlement agreement on the grounds that the claimant's post-settlement back problems provided no proof that the parties were mistaken as to the nature and extent of the claimant's condition at the time of settlement. *South*, 275 Mont. at 399-400, 913 P.2d at 234-35.

¶38 On appeal, we found no error in the WCC's conclusion in *South* that the parties were not mistaken regarding the nature and extent of claimant's injury *at the time the contract was formed*. We did not end our inquiry there, however, as we did find error in the WCC's failure to consider the claimant's contention of mutual mistake regarding the propriety of the job approved for her to do. *South*, 275 Mont. at 403, 913 P.2d at 236. Thus, we did not rescind the settlement agreement in *South* based on a mutual mistake as to the claimant's injury, but on the mistaken belief that massage therapist was an appropriate job for the claimant to pursue.

15

¶39 Therefore, contrary to Henry's assertions, these cases establish that, in order to constitute a mistake of fact justifying rescission, a mistake regarding the nature and extent of a claimant's condition must be with respect to a claimant's condition *as it exists at the time of settlement* and not with respect to a condition that develops at some point in the future.

¶40 In the instant case, it is undisputed that Henry did not have Parkinson's disease until approximately ten years after he signed the settlement agreement. And, at the time the parties entered into the settlement agreement, no one could have foreseen that Henry would develop Parkinson's disease.

¶41 Judith Hosford, who had been employed by Industrial in 1988 to handle the adjusting of Henry's claim, testified by deposition and at trial that prior to 2004, Henry's main complaints dealt with cognitive problems and pain issues. Hosford, who was a former Certified Nurse Assistant with a background in dealing with brain-injured patients, testified that she was aware of deterioration in people who suffered brain injuries, but that she did not expect Parkinson's. Hence, she testified that in her experience, head injuries always get worse, they never get better. Moreover, Hosford asserted that in 1994, when the parties entered into the settlement agreement, not only was she unaware of any connection between head injuries and Parkinson's disease, Henry's medical records indicated that he was stable. Hosford further testified that it was the Kruziches and their attorney who wanted to close domiciliary care as part of settlement because they "wanted Work Comp basically out of their life."

16

¶42   Kathy testified that at the time the parties' were attempting to settle Henry's claim, she also believed that Henry's condition had stabilized. She had done some research and reading concerning brain injuries, but she did not learn anything about long-term deterioration following a brain injury. Nether did she discuss long-term deterioration with any of Henry's doctors.

¶43   Kathy also testified that in November 1990, Community Medical Center in Missoula provided Kathy with some articles on brain injuries, but those articles made no mention of long-term deterioration. She also testified that she and Henry belonged to a head injury support group for about a year. While this group occasionally had doctors as guest speakers, Kathy did not recall receiving any information from the group or from any of its guest speakers indicating that Henry's condition might worsen.

¶44   Furthermore, Henry was examined by a neurologist in January 1993 who noted that Henry had "normal strength, tone and cerebellar function." And, in August and September 2003, Henry saw a physiatrist who noted that Henry had normal upper and lower extremity strength, normal coordination, and normal gait and balance. In addition, one of Henry's treating physicians indicated that Henry's condition had stabilized.

¶45   Thus, because Henry's Parkinson's disease did not exist at the time of settlement, the parties' failure to anticipate that future condition was not a mistake as to the nature and extent of Henry's condition at the time of settlement. In order to justify rescission, the mistake must have occurred at the time of settlement, and must thus relate to the claimant's condition *as it existed at that time*.

¶46   In rescinding the settlement agreement, the WCC stated that

there is a clear distinction between the deterioration or worsening of a condition and the development of an entirely distinct disorder. While a deterioration or worsening of [Henry's] cognitive abilities would perhaps have been foreseeable, that is not the case before this Court. Rather, [Henry] developed a distinct physical ailment as a direct result of his industrial accident, *the possibility of which neither party was aware at the time the claim was settled*. [Emphasis added.]

Although the court recognized that at the time the parties executed the settlement agreement, neither party could have foreseen that Henry would develop Parkinson's disease, the court then went on to erroneously conclude that this constituted a mutual mistake of fact. As we have already determined, the doctrine of mutual mistake applies only to known facts that existed at the time the settlement agreement was executed.

¶47 The public policy of this State is to encourage settlement and avoid unnecessary litigation. *Augustine v. Simonson*, 283 Mont 259, 266, 940 P.2d 116, 120 (1997) (citing *Holmberg v. Strong*, 272 Mont. 101, 106, 899 P.2d 1097, 1100 (1995)). Thus, we have stated that to encourage settlement and preserve the sanctity of workers' compensation settlement agreements, we will reopen such agreements only "rarely and reluctantly." *South*, 275 Mont. at 406, 913 P.2d at 238 (Erdman, J., dissenting) (citing *Whitcher v. Winter Hardware Co.*, 236 Mont. 289, 769 P.2d 1215 (1989)). If we were to uphold the WCC and fashion a new rule that unanticipated future medical conditions could retroactively create mutual mistakes at the time of settlement, then settlement agreements would not be worth the paper they are written on because any unanticipated medical condition would justify rescission.

¶48 Accordingly, we hold that the WCC erred in rescinding the settlement agreement based upon mutual mistake of fact.

¶49 That said, the Dissent has raised several contentions that deserve a response. First, the Dissent complains that we have parted ways "with three decades of mutual mistake of fact analysis in the context of workers' compensation law," Dissent, ¶ 59, as though a separate doctrine applies to WC cases than applies to other types of cases. Contrary to this assertion, the mutual mistake of fact doctrine is the same no matter what type of case is involved—WC cases are not governed by a separate body of law.

¶50 Second, the Dissent faults this Court for "disregard[ing] the limited scope of our review of findings made by the WCC." Dissent, ¶ 59. Based on our decision in *Gamble v. Sears*, 2007 MT 131, 337 Mont. 354, 160 P.3d 537, the Dissent argues that because substantial credible evidence supports the WCC's finding that "Henry's injury was present at the time of the 1994 settlement agreement," Dissent, ¶ 60, we may not consider contrary findings. However, the WCC made no such finding. Rather, the WCC found:

> In January 1993, [Henry] was examined by a neurologist, Dr. Scott D. Callaghan, at the request of [Old Republic]. Dr. Callaghan noted, among other findings, "In regards to this patient motorically, this seems to be normal function in that he has normal strength, tone and cerebellar function."
> [Henry] saw physiatrist Dr. Allen M. Weinert, Jr. on August 29, 2003, and again on September 22, 2003. On both visits, Dr. Weinert noted normal upper and lower extremity strength, normal coordination, and normal gait and balance.

Thus, unlike *Gamble* where the WCC's findings were based on medical evidence establishing that Gamble's injury *existed at the time of the settlement agreement,* the medical evidence in the instant case established that Henry's Parkinson's disease *did not exist* at the time of the settlement agreement. To that end the WCC concluded that

19

there is a clear distinction between the deterioration or worsening of a condition and the development of an entirely distinct disorder. While a deterioration or worsening of [Henry's] cognitive abilities would perhaps have been foreseeable, that is not the case before this Court. Rather, [Henry] *developed a distinct physical ailment* as a direct result of his industrial accident, *the possibility of which neither party was aware at the time the claim was settled.* [Emphasis added.]

¶51 Third, the Dissent states that the "source of the Court's reasoning . . . remains far from clear." Dissent, ¶ 66. What could be clearer than Montana's mistake-of-fact doctrine, quoted in ¶ 25 of this Opinion, which specifically states that a mistake of fact is "an unconscious ignorance or forgetfulness of a fact, *past or present*, material to the contract" or a "belief in the *present existence* of a thing material to the contract which does not exist or in the *past existence* of such a thing which has not existed." Section 28-2-409, MCA (emphasis added). Indeed, the Court's reasoning is mandated by the black-letter law of this State which the Dissent does not so much as mention.

¶52 Fourth, the Dissent contends that we have failed to distinguish Henry's claim from the factual scenarios in *Kienas*, *Weldele*, *Kimes*, *Wolfe* and *South*. Nothing could be further from the truth. As we have stated, the injury complained of in *each* of these cases existed *at the time of* the settlement agreement. In the instant case, it is undisputed that Henry's Parkinson's disease did not exist at the time of the settlement agreement and no one—not his doctors, not the insurance adjustor, not Henry, and not his wife—foresaw that Henry would develop Parkinson's disease sixteen years after his accident. Additionally, while the Dissent contends that "we address an *undetected* injury that had

20

occurred in 1988," Dissent, ¶ 82 (emphasis added), Henry's Parkinson's disease was not "undetected" in 1988. It did not exist in 1988—there was nothing there to detect.[3]

¶53    Furthermore, there is absolutely no evidence in the record before this Court that, *at the time the settlement agreement was executed,* Henry suffered an "injury" of Parkinson's disease or even that Henry would develop that disease sixteen years later. The WCC reached that very conclusion. In attempting to craft a theory to undo the settlement agreement and to compensate Henry, the Dissent refuses to acknowledge that the legal issue before this Court is whether the settlement agreement was entered into under a mutual mistake of *past* or *existing* fact. Section 28-2-409, MCA. Quite simply, the parties could not be mutually mistaken about a fact that did not exist then and exists now only because Henry developed Parkinson's disease a decade and a half after his industrial accident. If, as the Dissent posits, the mutual mistake-of-fact doctrine could be undone at a later date because of 20/20 hindsight, then the doctrine would cease to have any legal utility at all.

¶54    Fifth, the Dissent complains that we incorrectly lump cases involving injured workers together with cases involving electric co-ops, railroads, and ex-spouses. Dissent, ¶ 85. The Dissent continues to harbor the mistaken belief that a separate doctrine regarding mutual mistake of fact applies to WC cases than applies to all other types of cases. The cases cited in the Opinion that the Dissent takes issue with—*Southwestern*, *Consolidated* and *Ryan*—are all cases involving the doctrine of mutual mistake of fact

---

[3] To "detect" means "to discover the *existence* or *presence* of." *The Collins English Dictionary* 421 (Patrick Hanks ed, 2d ed., Collins 1986) (emphasis added).

and are cited and examined to shed further light on this doctrine and to illustrate how it has been applied in other jurisdictions.

¶55   Finally, the Dissent points out that the intent and purpose of workers' compensation law involves the "need to fairly compensate the injured worker."  Dissent, ¶ 59.  We agree.  However, one's subjective perception of "fairness" cannot be achieved by simply ignoring governing statutory law and our dispositive jurisprudence—at least in the absence of some other legal challenge not at issue here.  We sympathize with the plight of the Kruziches.  And, if repeating the horrific circumstances of Henry's industrial accident in mantra-like fashion could change the law, then the outcome of this appeal might well be different.  The legal issue before us, however, is not complex.  It involves the doctrine of mutual mistake of fact, the law of which is well-established.  Old Republic, like any other litigant appearing before this Court, is entitled to our impartial application of the law—an approach that can hardly ever be fairly characterized as a "windfall," Dissent, ¶ 85, to the prevailing party, regardless of the result.

¶56   On the undisputed facts of this case, we hold that the WCC erred in its application of the law of mutual mistake of fact.  Accordingly, we must reverse the court's legal determination in that regard.

¶57   Reversed.

/S/ JAMES C. NELSON

We Concur:

/S/ JOHN WARNER

22

/S/ JIM RICE
/S/ PATRICIA COTTER

Justice Brian Morris dissents.

¶58 The WCC concluded that neither party contemplated at the time of the settlement that Henry would develop a movement disorder directly attributable to being hit in the face with an ore bucket in 1988. The Court determines that the WCC unjustifiably reached this conclusion in light of the fact that a mutual mistake that would justify rescinding a settlement agreement "must be with respect to a claimant's condition *as it exists at the time of settlement* and not with respect to a condition that develops at some point in the future." ¶ 39 (emphasis in original). I disagree with the Court's analysis of mutual mistake of fact as applied here. I dissent.

¶59 The Court's analysis parts ways with three decades of mutual mistake of fact analysis in the context of workers' compensation law. The Court's analysis also defeats the very intent and purpose of the workers' compensation law--the "need to fairly compensate the injured worker . . . ." *Weldele*, 227 Mont. at 261, 738 P.2d at 1283. Finally, the Court's analysis disregards the limited scope of our review of findings made by the WCC. *Gamble*, ¶ 20.

23

¶60    As noted by the Court in *Gamble*, we must determine only whether substantial credible evidence supports the WCC's finding that Henry's movement disorder was caused by the 1988 accident and that Henry's injury was present at the time of the 1994 settlement agreement. *Gamble*, ¶ 28. The claimant in *Gamble* alleged that she had suffered symptoms since the time of her accident, but she conceded that she had never reported the symptoms to her treating physician. *Gamble*, ¶ 29. The defendant argued that the claimant's failure to report her symptoms demonstrated that the injury had not existed at the time of the settlement. *Gamble*, ¶ 29. The Court's limited standard of review precluded it, however, from rendering its own judgment regarding this alleged inconsistency. *Gamble*, ¶ 30. We face no similar inconsistency here. The WCC found, and Old Republic concedes, that Henry's 1988 industrial accident caused his movement disorder. We also know that Henry's movement disorder was present at the time of the 1994 settlement, as the 1988 accident caused the movement disorder. ¶ 22. Henry suffered no head trauma before or after his accident in 1988, thereby eliminating other possible causes. *Gamble*, ¶ 44.

¶61    The Court concedes that substantial credible evidence supported this finding and numerous other findings made by the WCC. ¶¶ 22, 40-44. The ore bucket crushed Henry's skull. Doctors had to remove bone fragments from Henry's brain. The Virginia Mason Clinic in Seattle, Washington, conducted a battery of tests on Henry in March 1990. The Clinic's testing revealed that Henry had sustained a number of cognitive impairments as a result of having his skull crushed by the ore bucket. The Clinic specifically determined that Henry "had reductions in speed of thinking, reductions in the

24

flexibility of thinking, significant problems with visual spatial memory, reductions in fine motor speed, reductions in grip strength in the right hand, problems with complex tactual spatial problem-solving, and a tendency to lose complex visual spatial information." The Clinic did not diagnose any movement disorder in Henry at that time.

¶62 Henry's medical records reveal that before 1994 he suffered from problems "such as headaches and facial pain, depression, irritability, and difficulties with concentration and memory." Although Henry's medical records documented these symptoms, Kathy believed that Henry's cognitive condition had stabilized by February 1994. Old Republic agreed that Henry's medical records indicated that he had stabilized by 1994. Dr. Scott D. Callaghan, a neurologist, had examined Henry in January 1993 at Old Republic's request. Dr. Callaghan noted, among other findings, "[i]n regards to this patient motorically, this seems to be normal function in that he has normal strength, tone, and cerebellar function." Dr. Stone also had noted that "[t]hings appear to be very stable." The mistaken belief that Henry's condition had stabilized led the parties to enter a settlement in June 1994.

¶63 By 2004, however, Henry began to exhibit symptoms of a movement disorder. Dr. Allen M. Weinert, Jr., a physiatrist, or rehabilitation physician, examined Henry on June 30, 2004. Dr. Weinert's physical examination revealed a pill rolling tremor in Henry's left hand. Dr. Weinert also diagnosed left-sided Parkinsonism, "most likely as a late sequela of traumatic brain injury." Further examinations by Dr. Weinert revealed a worsening of Henry's Parkinsonism symptoms.

25

¶64 Old Republic's representative, Judith Hosford, testified that she was aware of "deterioration" in people who have suffered a brain injury. Hosfort added, however, that she "didn't expect Parkinson's." Hosford further conceded that in 1994 she was unaware of any connection between head injuries and Parkinson's or Parkinson's plus. Hosford did not contest Dr. Weinert's determination that having his skull crushed by the ore bucket had caused Henry's movement disorder. The WCC specifically found that Henry's movement disorder, diagnosed in 2004, "is related to and caused by [Henry's] industrial injury."

¶65 The Court takes issue with none of these findings. In fact, the Court concedes that "substantial credible evidence does support the WCC's finding that Henry's Parkinson's disease was caused by his 1988 injury . . . ." ¶ 22. The Court nevertheless rejects Henry's claim. The Court characterizes its decision as an adherence to the widely accepted rule that a failure to predict the future does not constitute a mistake of fact as contemplated by the mutual mistake doctrine. ¶ 23. The Court notes that Henry did not suffer from Parkinson's symptoms at the time of the settlement in 1994. ¶ 22. As a result, the Court concludes that "the parties' failure to predict Henry's Parkinson's disease was not a mutual mistake of fact." ¶ 23.

¶66 The Court's conclusion rests upon the notion that the mistake must have occurred at the time of the 1994 settlement, and the mistake must relate to Henry's condition as it existed at that time. ¶ 45. The source of the Court's reasoning, however, remains far from clear. The Court discusses at length other workers' compensation cases, but fails to

26

distinguish Henry's claim from the factual scenarios upon which the Court rescinded the settlement agreements. ¶¶ 31-38.

¶67 For example, the Court reasons that the parties in *Kienas* were ignorant of the fact that the claimant's workplace accident *could* have aggravated his pre-existing cerebral palsy. ¶ 32. In fact, the *Kienas* Court noted that neither party at the time of entering the settlement "knew of the exact nature or extent of the injury suffered by claimant." *Kienas*, 191 Mont. at 329, 624 P.2d at 3. In other words, the treating medical providers had failed to diagnose fully the extent of the claimant's injuries. ¶ 32. The Court in *Kienas* accepted as a mutual mistake the parties' ignorance of the possible aggravation, or the extent, of a known injury.

¶68 Here, however, we do not face a question concerning the aggravation of a known injury. Henry's case presents the issue of an injury unknown to the parties at the time of the settlement. Dr. Weinert determined that having his skull crushed in by the ore bucket in 1988 had caused Henry's movement disorder that had remained latent until 2004. The WCC and this Court adopted this determination without objection from Old Republic. Dr. Weinert's 2004 examination demonstrates, at the very least, that the parties did not know in 1994 the "exact nature or extent of the injury" suffered by Henry. *Kienas*, 191 Mont. at 329, 624 P.2d at 3.

¶69 Similarly, the Court characterizes the mutual mistake in *Weldele* as arising from the fact that the treating medical providers had failed to diagnose that the claimant suffered from thoracic outlet syndrome as a result of his industrial accident. ¶ 33. The Court in *Weldele* relied upon the fact that doctors who had treated the claimant for

27

thoracic outlet syndrome "believed the syndrome was caused by his 1978 accident." *Weldele*, 227 Mont. at 261, 738 P.2d at 1283. The WCC in this case, of course, specifically found that getting hit in the face with an ore bucket in 1988 had caused Henry's movement disorder.

¶70 The Court distinguishes *Kimes* on the basis that medical providers had failed to diagnose an injury that existed at the time of the settlement. ¶ 34. The Court in *Kimes* relied on the fact that Kimes had a tear in his medial meniscus, and that this injury remained unknown to the parties at the time of the settlement. *Kimes*, 233 Mont. at 177, 759 P.2d at 987. The Court in *Kimes* determined that a mutual mistake existed despite the fact that Kimes knew at the time of the settlement that potentially permanent problems existed with the injured knee.

¶71 The Court in *Kimes* found support in the fact that Kimes's disability rating had increased as a result of the post-settlement surgery to remove a torn meniscus and that Kimes's prognosis now includes probable degenerative changes in the knee joint. The Court also cited the fact that Kimes now required pain medication and had been advised after the settlement not to return to his former line of work as a cook. *Kimes*, 233 Mont. at 178, 759 P.2d at 988. Here, as found by the WCC, everyone knew that Henry suffered from cognitive disorders as a result of getting hit in the face with an ore bucket. Nobody, neither Henry's wife, nor Old Republic, nor any of the medical providers who had examined Henry, knew that Henry also suffered from a movement disorder as a result of getting hit in the face with an ore bucket. Furthermore, no party disputes that Henry's

medical reports revealed a much worse condition today than at the time of the settlement agreement in 1994.

¶72 The Court confines its analysis of *Wolfe* based on the fact that our review was limited to the question of whether the claimant's shoulder "was injured *at the time of his settlement agreement . . . .*" ¶ 36 (emphasis in original). The Court in *Wolfe* determined that substantial evidence demonstrated that the "claimant's injury to his right shoulder was caused by his industrial accident . . . ." *Wolfe*, 251 Mont. at 231, 824 P.2d at 248. This Court omits the fact that the Court in *Wolfe* reached its determination based upon the claimant's clear and unequivocal testimony that he "sustained no trauma to his right shoulder either before or after his industrial injury." *Wolfe*, 251 Mont. at 231, 824 P.2d at 248.

¶73 Henry, too, sustained no trauma to his head either before or after his industrial accident in 1988. This elimination of other potential causes of Henry's movement disorder represents an important element in determining whether sufficient evidence supports the WCC's decision to rescind the settlement agreement. *Gamble*, ¶ 44. The WCC found, and this Court concedes, as it must, that getting hit in the face with an ore bucket in 1988 caused Henry's movement disorder. ¶ 22. Like the claimant in *Wolfe*, Henry had sustained this injury at the time of the settlement.

¶74 The Court struggles to distinguish *South* from the situation presented here. The distinction that the Court attempts to draw between Henry's claim and the cited mutual mistakes regarding a claimant's condition at the time of the settlement--("ignorance of the fact that claimant's workplace accident could have aggravated his pre-existing

29

cerebral palsy," ¶ 32), ("claimant had thoracic outlet syndrome at the time of the settlement," ¶ 33), ("both parties were ignorant of an injury that actually existed at the time of settlement," ¶ 34); and ("claimant's shoulder was injured at the time of his settlement," ¶ 36)--founders in the face of *South*. In *South*, the parties "were not mistaken regarding the nature and extent of claimant's injury at the time the contract was formed." ¶ 38.

¶75 The claimant in *South* aggravated her existing lower back injury while training to work as a massage therapist. *South*, 275 Mont. at 403, 913 P.2d at 236. Neither party in *South* suffered any illusions regarding the fact that the claimant had suffered a lower back injury. A doctor had advised the parties, however, that the claimant could work as a massage therapist despite her injury, and the parties settled the claim. The Court rescinded the settlement based upon the fact that the parties believed at the time of the settlement, erroneously as it turned out, that the claimant could work as a massage therapist. *South*, 275 Mont. at 404-05, 913 P.2d at 237. Similarly, a number of Henry's doctors also had advised the parties at the time of the settlement in 1994, erroneously as it also turned out, that Henry's condition had stabilized.

¶76 The medical providers did not know "of the exact nature or extent of the injury suffered by [Henry]," as a result of getting hit in the face with an ore bucket. *Kienas*, 191 Mont. at 329, 624 P.2d at 3. Henry's previously undiagnosed movement disorder cannot be dismissed reasonably as a mere "variance in the symptom level." *Kimes*, 233 Mont. at 178, 759 P.2d at 988. Various medical providers may have warned Kathy that the symptoms of Henry's cognitive disorders could vary over time. Nothing in the record

indicates, however, that any medical providers, or Old Republic, for that matter, ever warned Kathy that an undiagnosed movement disorder could arise directly from Henry having gotten hit in the face with an ore bucket.

¶77 The Court compounds its crabbed interpretation of Montana's mutual mistake cases by injecting into its analysis a series of mutual mistake cases outside the context of the workers' compensation system. The Court cites *United States v. Southwestern Elec. Co-op, Inc.*, 869 F.2d 310, 314 (7th Cir. 1989), for the proposition that a failure to predict the future cannot constitute a mutual mistake. ¶ 28. The Court in *Southwestern Electric* examined an unexpected increase in the cost of building power plants that bore no relation to the wholesale power contract entered by the parties. This Court equates the unexpected increase in the cost of building power plants with Henry's unexpected development of a movement disorder. The unexpected increase in cost in *Southwestern Electric* had no relation to the parties' contract, whereas Dr. Weinert and the WCC determined that Henry's movement disorder arose as a direct result of the industrial accident that formed the basis for the parties' settlement.

¶78 The Court also cites *Consolidated Rail Corp. v. Portlight, Inc.*, 188 F.3d 93, 97 (3rd Cir. 1999), for its reliance on two Pennsylvania cases where the courts held that "a party who underestimates the future severity of her injuries will not be permitted to avoid the consequences of a settlement agreement based on mutual mistake." ¶ 29. The court in *Consolidated Rail Corp.* considered Conrail's attempt to rescind a settlement agreement with Portlight regarding a dispute over lost freight. Conrail argued that neither party had any knowledge at the time of the settlement agreement of a controlling

limitation on Conrail's liability for lost goods. *Consolidated Rail Corp.*, 188 F.3d at 95. Conrail filed an action to rescind the settlement agreement with Portlight based upon this claimed mutual mistake of fact. The district court dismissed the action on the pleadings. *Consolidated Rail Corp.*, 188 F.3d at 95. The court of appeals reversed, holding that the district court mistakenly had determined that Conrail's mutual mistake claim was not viable as a matter of law. *Consolidated Rail Corp.*, 188 F.3d at 97.

¶79 The Court finally relies upon the West Virginia supreme court's resolution of an alimony dispute in *Ryan v. Ryan*, 640 S.E.2d 64 (W. Va. 2006). ¶ 30. The wife in *Ryan* contended that both parties mistakenly had assumed that certain investments would generate enough income to avoid the need of the husband to pay alimony. The investments failed to generate sufficient income and the wife sought to rescind the property settlement agreement under the mutual mistake doctrine. *Ryan*, 640 S.E.2d at 68. Not surprisingly, the court held that the parties' mistaken expectation regarding the amount of income that the investments would generate did not warrant rescinding the property settlement agreement. *Ryan*, 640 S.E.2d at 69.

¶80 *Ryan* simply stands for the reasonable proposition that the parties' expectation of future events cannot support a mutual mistake claim. The parties may have held unrealistic expectations at the time of the settlement regarding the amount of income that the investments would generate. The investment fund managers may have made mistakes after the parties' settlement and entirely unrelated to the parties' settlement that depressed the investments' returns. Here the parties knew at the time of the settlement that Henry suffered from cognitive impairments and pain as a result of getting hit in the

32

face with an ore bucket. In contrast to the parties in *Ryan*, however, the parties did not know that Henry also would suffer from a movement disorder as a direct result of having his skull crushed by the ore bucket. Henry "sustained no trauma" to his head "either before or after his industrial injury" that would cause him to develop a movement disorder. *Wolfe*, 251 Mont. at 231, 824 P.2d at 248. The die had been cast in 1988 when the ore bucket struck Henry in the face.

¶81    Henry sustained injuries in 1988. The symptoms of some of Henry's injuries appeared immediately. Henry's medical providers identified additional injuries in the period following the accident through testing and from the appearance of new symptoms. Henry's medical providers failed to identify, however, the injury to Henry's brain that constituted the direct cause of his movement disorder until 2004, ten years after the parties had settled Henry's claim. The movement disorder constituted a "late sequela of [a] traumatic brain injury" that had occurred in 1988. Henry sustained no new injuries to his brain after the 1988 accident. *Gamble*, ¶ 44.

¶82    For Henry, any cognitive deterioration or increase in pain could constitute a variance in the symptom level or an inaccurate expectation regarding a condition known at the time of the settlement. Both circumstances could fall outside the mutual mistake doctrine. In this case, on the other hand, we address an undetected injury that had occurred in 1988. The undetected injury remained unknown to the parties, however, at the time of the settlement in 1994. The Court rejects the notion that Henry's injury remained undetected at the time of the settlement. It argues that Henry's injury "did not exist" at that time and thus "there was nothing there to detect." ¶ 52. The Court's

33

reasoning misapprehends the concept of injury as contemplated by Montana Worker's Compensation Act.

¶83　According to the Act, an "injury" means, among other matters, an "internal or external physical harm to the body that is established by objective medical findings." Section 39-71-119(1)(a), MCA.　Dr. Weinert diagnosed Henry's movement disorder as having been caused by Henry's industrial accident in 1988.　Old Republic does not refute this objective medical finding.　The WCC specifically found that Henry's movement disorder "is related to and caused by [Henry's] industrial injury."　The Court concedes that substantial credible evidence supports this finding.　¶ 22.　As in *Gamble*, our limited standard of review precludes us from reaching any other conclusion.　*Gamble*, ¶ 30.

¶84　The Act further provides that an "injury" is caused by an accident.　Four separate components comprise an "accident" for purposes of the Act.　Henry's claim satisfies all four.　First, an accident is an unexpected traumatic incident.　Section 39-71-119(2)(a), MCA.　Henry certainly did not expect to suffer the trauma of getting hit in the face with an ore bucket.　An accident must be identifiable by time and place of occurrence.　Section 39-71-119(2)(b), MCA.　Henry's accident occurred at his place of work for Blue Range Mining Co. on August 16, 1988.　An accident must be identified by "member or part of the body affected."　Section 39-71-119(2)(c), MCA.　Besides crushing Henry's skull, his accident injured his brain in a manner that caused immediate cognitive impairments and pain and later manifested itself in the form of a movement disorder.　Finally, an accident must be caused by a specific event on a single day or during a single work shift.　Section 39-71-119(2)(d), MCA.　Dr. Weinert determined that getting hit in the face with an ore

bucket on August 16, 1988, caused Henry's movement disorder. The WCC agreed and the Court concedes that substantial evidence supports the WCC's finding. ¶ 22.

¶85 The consequences of Henry's tragic accident reverberate to this day. The consequences include the fact that Henry suffers from a severe movement disorder that no one contemplated at the time of the settlement in 1994. Now the Court forces Kathy and Henry to suffer the burden of the parties' ignorance regarding Henry's actual condition at the time of the settlement in 1994. Old Republic will reap the windfall of the parties' ignorance. The Court's mutual mistake analysis lumps injured workers with incomplete diagnoses with electric coops who underestimate the cost of building new power plants, *Southwestern Electric*, with railroads who fail to investigate liability agreements before settling claims, *Consolidated Rail Corp.*, and with ex-spouses disappointed by bear markets, *Ryan*. Henry deserves the same treatment as the fragile massage therapist in *South*, as the retail stocker in *Gamble*, and as the other injured workers properly covered by the worker's compensation system for the full extent of their injuries. I dissent.

/S/ BRIAN MORRIS