No. 01-327

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 303N

TONETTE ROMERO,

Petitioner/Appellant,

v.

LIBERTY MUTUAL FIRE INSURANCE COMPANY,

Respondent/Insurer for

SUPERVALU, INCORPORATED,

Employer.

and

STATE COMPENSATION INSURANCE FUND,

Respondent/Co-Appellant/Insurer for

DUANE L. HOUSE, d/b/a COMMERCIAL

BUILDING MAINTENANCE,

Employer.

APPEAL FROM: Montana Workers' Compensation Court,

The Honorable Mike McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

James G. Edmiston, III, Edmiston & Schermerhorn, Billings, Montana

For Respondent Liberty Mutual Fire Ins. Co.:

William J. Mattix, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Montana

For Respondent State Compensation Ins. Fund:

Michael P. Heringer, Lisa A. Speare, Brown Law Firm, P.C., Billings, Montana

Submitted on Briefs: October 11, 2001

Decided: December 28, 2001

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2 The Appellant, Tonette Romero, filed an occupational disease claim in which she alleged that her job at the Rimrock County Market in Billings caused left shoulder problems. The Montana Department of Labor referred the claim to the Occupational Disease Panel, which denied Romero's claim. Romero appealed to the Workers' Compensation Court. The Workers' Compensation Court ordered that the State Fund be joined as a party. Following a hearing, the Court concluded that the State Fund was solely liable for payment of Romero's benefits. Romero and the State Fund appeal the Workers' Compensation Court's decision. We affirm the judgment of the Workers' Compensation Court.

¶3 The issue on appeal is whether there was substantial evidence to support the Workers' Compensation Court's finding that Romero does not have an occupational disease caused by her employment at County Market.

## FACTUAL BACKGROUND

¶4 On February 26, 1992, Tonette Romero injured her right shoulder while working for Commercial Building Maintenance. CBM was insured by the State Compensation Insurance Fund, which accepted liability for Romero's injury to her right shoulder.

¶5 Romero was initially treated by Dr. Richard P. Lewallen, who concluded that she had muscle inflammation which was causing muscle spasms and prescribed anti-inflammatory medication. Romero was off work for several years as a result of this injury. Romero continues to receive temporary total disability benefits from the State Fund as a result of her injury.

¶6 Romero's right shoulder did not improve and she was examined in August 1992 by Dr. Neil Meyer and in September 1992 by Dr. John Cook. Dr. Neil concluded that Romero probably had thoracic outlet syndrome on the right side. Dr. Cook found only minimal evidence of neurovascular compression at the thoracic outlet on the right.

¶7 In December 1992, Dr. Lewallen referred Romero to Dr. William Shaw, who noted that Romero was beginning to experience symptoms in her left arm.

¶8 By April 1993, Dr. Lewallen felt that Romero had reached Maximum Medical Improvement, gave her a 2% permanent physical impairment rating, and released her to work with no restrictions.

¶9 Romero underwent a functional capacities evaluation in September of 1993. The FCE demonstrated that Romero was capable of light work but confirmed that she was very dependent on her left upper extremity for daily activities.

¶10 In February 1994, the State Fund requested that Dr. Cook reevaluate Romero and provide a "definitive diagnosis and prognosis." Dr. Cook noted that Romero's symptoms had not improved and that, due to right shoulder pain, she was using "only her left arm for any significant physical activity." Dr. Cook did not find significant evidence of thoracic outlet syndrome and observed that precise diagnosis of Romero's condition was difficult.

¶11 With the State Fund's approval, Romero began receiving treatment from Dr. Richard A. Nelson on April 13, 1994. Dr. Nelson did not find evidence of thoracic outlet syndrome, but noted that it was difficult to test Romero because she had limited range of motion in her arm. By December 2, 1994, Dr. Nelson noted significant symptoms in Romero's left arm and shoulder, which he speculated were related to increased reliance on her left arm while caring for her child. On March 21, 1996, Dr. Nelson noted that Romero's left shoulder was bothering her even more than her right shoulder.

¶12 In 1996, Romero worked for short periods as a housekeeper and at ShopKo. She had difficulty performing housekeeping tasks and Dr. Nelson advised her to find lighter work.

¶13 On November 25, 1997, Romero began part-time work in the bakery at the Rimrock County Market in Billings. Within two weeks, she went back to Dr. Nelson, who noted that her physical status fluctuated "according to activities and as one would expect it will become activated with overloading and create increased pain syndrome." At Dr. Nelson's suggestion, Romero stopped working at County Market as of March 3, 1998, and has not returned to work since.

¶14 On June 29, 1998, Romero filed a claim for workers' compensation. She claimed that the heavy, repetitive lifting required by the bakery job caused persistent numbness, tingling, and pain in her neck, both arms, both shoulders, and upper back. Romero did not relate her condition to any specific incident at County Market. She claimed that her symptoms "came on over time." On September 11, 1998, Romero was examined by Dr. John I. Moseley, who diagnosed right thoracic outlet syndrome, possible early left thoracic outlet syndrome, and right carpel tunnel syndrome.

¶15 County Market's insurer, Liberty Mutual, denied Romero's claim. The Montana Department of Labor and Industry referred the claim to the Occupational Disease Panel, which appointed Dr. Thomas L. Schumann as the medical examiner pursuant to § 39-72-602(2), MCA. Based on Dr. Schumann's finding that Romero's employment at County Market did not cause her left arm condition, the Department issued an order denying Romero's claim. Romero appealed the Department's order to the Workers' Compensation Court.

¶16 The Workers' Compensation Court scheduled a hearing for February 1, 2000. At the hearing, the Court ordered that the State Fund be joined as a party based on Romero's prior injury suffered while her employer was insured by the State Fund.

¶17 On July 5, 2000, the Court held a hearing to consider evidence in support of Romero's claim for occupational disease compensation. Romero testified about her medical history. Also submitted were Dr. Nelson's deposition, Dr. Schumann's report, and Romero's medical records.

¶18 On January 29, 2001, the Workers' Compensation Court issued its Judgment. The Court noted that there was no question that one of the two insurers was liable for Romero's injuries and found that Romero's left arm condition was a natural progression of her 1992 injury, and that Romero's left-sided problems did not develop as a result of her job at County Market. Because the left arm injury was sustained while Romero was employed by a State Fund insured, the Workers' Compensation Court concluded that the State Fund was solely liable for Romero's claim.

## STANDARD OF REVIEW

¶19 We review the Workers' Compensation Court's findings of fact to determine if they are supported by substantial, credible evidence, and we review its conclusions of law to determine if they are correct. *Turjan v. Valley View Estates* (1995), 272 Mont. 386, 390, 901 P.2d 76, 79.

## DISCUSSION

¶20 Was there substantial evidence to support the Workers' Compensation Court's finding that Romero does not have an occupational disease caused by her employment at County Market?

¶21 The issue before the Workers' Compensation Court was whether Romero's left arm condition was aggravated by her work at County Market or whether it was merely a natural progression of her 1992 injury. Resolution of this issue required the Workers' Compensation Court to apply the "last injurious exposure" rule found at § 39-72-303(1), MCA, to Romero's claim. The "last injurious exposure" rule provides that: "Where compensation is payable for an occupational disease, the only employer liable is the employer in whose employment the employee was last injuriously exposed to the hazard of the disease." § 39-72-303(1), MCA. Based on its finding that Romero's left shoulder condition was already symptomatic when she began work at County Market, the Workers' Compensation Court concluded that Romero's left shoulder injury was a natural progression of her prior injury and, therefore, was not an occupational disease for which

County Market was liable.

¶22 Romero and the State Fund contend that there was substantial evidence that the aggravation to her left shoulder was caused by her job at County Market and that the Workers' Compensation Court's finding to the contrary was not supported by substantial evidence. Moreover, according to the State Fund and Romero, the Workers' Compensation Court ignored the "last injurious exposure" rule because substantial evidence demonstrated that Romero suffered a significant aggravation of her condition in both shoulders as a result of her work at County Market.

¶23 Liberty Mutual responds, and we conclude, that substantial evidence supports the Workers' Compensation Court's finding that Romero's left shoulder problems are causally related to her original 1992 injury for which the State Fund is admittedly liable.

¶24 In his report, Dr. Schumann diagnosed Romero with respect to the criteria for occupational diseases set forth in § 39-72-408, MCA. Dr. Schumann found that Romero's employment at County Market did not cause her left arm condition. Rather, he concluded that Romero's long medical history in combination with her lack of improvement following six months of abstention from work indicated a cause of her condition other than her employment at County Market.

¶25 Dr. Nelson testified that Dr. Moseley's diagnosis more than six months after Romero terminated her employment at County Market was essentially the same as the diagnosis he made before Romero started working at County Market:

> Q. And in that report, Dr. Moseley gave a report of his examination of Ms. Romero, didn't he?
>
> A. Yes, he did.
>
> Q. And he indicated that palpation above the right and left clavicle were significant for pain in the arm, much worse on the right than on the left, true?
>
> A. That's correct.
>
> Q. And that's consistent with what her condition was prior to the time when she commenced working at County Market?

A. That's true.

Q. He noted the hyperabduction was severely abnormal in the right, but only to a mild degree on the left. And that's consistent with what her condition was prior to the time she went to work for County Market, isn't it?

A. Yes.

. . .

Q. And he didn't mention anything - well, that's consistent with what her condition was prior to the time she worked at County Market?

A. Yes.

Q. He doesn't note any finding of - with regard to a positive Phalen's sign on the left.

A. No.

Q. Did you interpret from that that Phalen's sign was negative on the left?

A. It probably was. You do them bilaterally, usually.

. . .

Q. Okay. He also noted that Ms. Romero's strength was normal except for right flexor pollicis brevis, which was weak at plus four over plus five, correct?

A. Right.

. . .

Q. What is that indicative of?

A C6 nerve root and the radial nerve. It's a sign of weakness at a given nerve root or a, in this case, the thoracic outlet was causing the problem.

Q. And he reported no such finding on the left, did he?

A. No.

Q. And that's consistent with what her condition was prior to the time she started working at County Market?

A. It seems to be, yes.

Q. He also reported that her sensory examination showed numbness from the right shoulder down to and including the entire hand on the right.

A. Yes.

Q. And he reported no such finding on the left.

A. That's correct.

Q. And that's consistent with what her condition was prior to the time she went to work at County Market?

A. Yes.

Q. He also reported that her left arm and legs had normal sensation, correct?

A. Yes.

Q. And that is also consistent with what her condition was prior to the time she went to work at County Market, isn't it?

A. Yes.

. . .

Q. Dr. Moseley, in his letter of September 11, 1998, indicated that Ms. Romero had a - what he described as - well, what he diagnosed as right thoracic syndrome, correct?

A. Yes.

Q. And you'd made that diagnosis prior to November 1998, correct?

A. Yes.

Q. He also indicated that she had an early left thoracic outlet syndrome, correct?

A. Right.

Q. And that was your diagnosis prior to November of 1997, wasn't it?

A. Yes.

Q. Prior to the time that Ms. Romero went to work at County Market, her symptomology waxed and waned and went from side to side, depending upon which arm she was using most, correct?

A. That's right.

Q. And the symptomology that she experienced on the left side was a direct result of her inability to use her right side, correct?

A. Primarily, yes.

Q. And that's been the same symptom pattern that she'd had since the time she stopped working at County Market, isn't it?

A. It has been, yes.

Q. Her symptoms continue to wax and wane, and it's - on the left, and the right more prominent, depending on how much she's been using that particular extremity?

A. That's correct.

¶26 Dr. Nelson further testified that Romero's overuse of her left arm had already caused low grade thoracic outlet syndrome before she started working at County Market. Moreover, Dr. Nelson testified that Romero experienced both left and right sided problems

since at least December of 1994:

¶27 Q. I have some redirect here for you, Doctor. Doctor, isn't it fair to say that you have seen Tonette Romero almost monthly since December 1994?

> A. Pretty close to that, yeah.

> Q. And in that period of time, she has consistently complained of pain in her shoulder girdle?

> A. That's right.

> Q. And sometimes it's been worse on the right, and sometimes it's been worse on the left.

> A. That's true.

> Q. And it's your opinion that the degree to which she's complaining of pain on one side versus the other has to do with the amount of use that that side is getting at that particular time as opposed to the other side, correct?

> A. That's correct.

> Q. And to the extent that she's experiencing pain on her left side, it's because she is - because her right side, as you indicated, is fairly nonfunctional.

> A. That's right.

¶28 Finally, although Romero denied that she had problems with her left shoulder between her 1992 injury and the commencement of her employment at County Market, the Workers' Compensation Court found her testimony incredible and unpersuasive and chose instead to rely on her documented medical history, Dr. Nelson's testimony, and Dr. Schumann's report.

¶29 We conclude that the "last injurious exposure" rule was correctly applied by the Workers' Compensation Court and that substantial evidence supports the Court's findings. Therefore, the Judgment of the Workers' Compensation Court is affirmed.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ JIM REGNIER

/S/ JAMES C. NELSON

/S/ PATRICIA COTTER

/S/ JIM RICE