DA 07-0651

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 306

CHARLES LANES,

        Petitioner and Appellee,

  v.

MONTANA STATE FUND,

        Respondent and Appellant.

APPEAL FROM:    Montana Workers' Compensation Court, WCC No. 2006-1638
                    Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Leo S. Ward, Browning, Kaleczyc, Berry & Hoven, Helena, Montana

        For Appellee:

                Bernard J. Everett, Knight, Dahood, Everett & Sievers,
                Anaconda, Montana

Submitted on Briefs:  August 13, 2008

Decided:  September 3, 2008

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 The Montana State Fund (State Fund) appeals a decision of the Workers' Compensation Court (WCC) which found it liable for occupational disease benefits to appellee Charles Lanes (Lanes). We affirm the decision of the WCC.

## FACTUAL AND PROCEDURAL BACKGROUND

¶1 Lanes began work as an electrician for MSE Technology (MSE) of Butte, Montana in 1991. His job duties included light and heavy industrial work, as well as standing, kneeling, crawling, and lifting anywhere from forty to fifty pounds on a regular basis. In addition, Lanes holds a bachelor of arts degree in ministry and bible theology. In 1988, he began performing minister duties for the Whitehall Assembly of God Church (Assembly) in Whitehall, Montana. Initially, he received $400.00 per month for his services, but when the Assembly could no longer pay him, he continued to serve without pay until February 2005.

¶2 In May 2001, Lanes sustained an occupational disease to his left knee while in the course and scope of his employment with MSE. State Fund, as MSE's workers' compensation insurer, accepted liability for Lanes' left knee condition. From the time that Lanes filed his occupational disease claim in May 2001, until he had knee surgery with Dr. Nicholas Blavatsky (Blavatsky) of Butte, Montana in April 2004, he continued working for MSE. After Lanes healed from the surgery and was released to full duty by Dr. Blavatsky, Lanes returned to work for MSE, but later accepted a reduction in force buyout in January 2005. Lanes testified that he would have continued working for MSE if the buyout had not been offered.

2

¶3     After surgery, Lanes' left knee improved for a period of time, but he eventually

began to experience progressive pain in that knee.  Lanes eventually developed a limp in

the left knee, and put more weight on his right knee to compensate.  Lanes testified that

he would stand primarily on his right leg to perform his electrician duties.  After Lanes

accepted the buyout, he put his name on a union list for future jobs, but then removed his

name by the fall of 2005 because he felt his knees were not strong enough for him to

perform future work.

¶4     From February 2005 until November 2005, the Assembly paid Lanes $800.00 per

month.  During that time, Lanes estimated that he worked approximately thirty hours per

week.  His job duties included studying the bible and preparing weekly sermons,

attending funerals and weddings, preaching, and visiting the sick and elderly.  According

to his testimony, these tasks required him to perform roughly the same physical duties as

daily living, including walking, standing, and sitting.  In the course of performing these

tasks, Lanes would have to walk on a variety of different surfaces and stand during the

sermons for approximately forty-five minutes.  Lanes testified that standing for his

sermons would aggravate the pain he felt in both knees after about thirty minutes, and

that he would lie down immediately after sermons to rest his knees.  After he rested, the

pain would return to its normal levels.  Lanes testified that the pain would always

alleviate with rest and that he did not believe it permanently worsened while he

performed his duties as a minister.

¶5     In November 2005, Lanes gave up his full-time position as a minister because he

felt that his knees prevented him from doing his duties; in particular, his left knee would

3

give way and be unable to support weight. On November 11, 2005, Lanes went back to see Dr. Blavatsky. Dr. Blavatsky noted that Lanes had more discomfort in his left knee as well as in his right, and that he had been unloading weight from the left knee to the right knee. He also noted that previous examinations of the right knee showed some changes, although they were not as advanced as his left knee. In deposition testimony, Dr. Blavatsky stated that Lanes' right knee had had no previous problems and did not start to bother him until after he had quit his employment with MSE. Pursuant to his examination of Lanes, Dr. Blavatsky reviewed job analyses for the electrician and minister positions and approved only the minister job, stating that Lanes was not employable in a position which required standing for any length of time, nor could he stoop, bend, climb, or regularly use stairs or ladders. Dr. Blavatsky classified the minister position as sedentary.

¶6 By January 2006, the increased pain in both Lanes' right and left knees effectively prevented Lanes from performing his duties as a minister. Lanes filed an occupational disease claim for his right knee with the State Fund on January 16, 2006. In his claim, Lanes alleged that his right knee occupational disease was the result of his employment as an electrician with MSE. The last date of his employment with MSE was January 18, 2005. In his claim, Lanes requested total disability benefits for bilateral occupational disease conditions that prevented him from working. The State Fund denied the claim and also stopped payment of all partial disability benefits to Lanes.

¶7 On April 20, 2006, Dr. Blavatsky wrote a letter to State Fund's counsel in which he opined that Lanes' knee complaints were based on his occupational exposure as an

4

electrician, and not due to his work as a minister. It was Dr. Blavatsky's opinion that the activities Lanes performed as a minister were sedentary and would not be responsible for the injuries to his knee. Instead, the "frequent stooping, bending, lifting and crawling during the course of [Lanes'] work as an electrical contractor and electrician would most likely be the source of his current complaints." In response, Patricia Hunt, a claims adjustor for State Fund, sent Dr. Blavatsky a letter seeking further clarification of Dr. Blavatsky's opinion in light of an expert opinion he rendered in a somewhat similar case, *Mont. State Fund v. Murray*, 2005 MT 97, 326 Mont. 516, 111 P.3d 210. In *Murray*, Dr. Blavatsky had opined that a claimant's job duties, which required him to walk and stand on hard surfaces, were a significant contribution to a claimant's pre-existing degenerative knee condition which eventually required knee surgery, and thus gave rise to a compensable occupational disease claim. *Murray*, ¶¶ 12, 16-17, 22. Ms. Hunt quoted to Dr. Blavatsky his expert testimony from the *Murray* case and provided a further job description of the types of tasks that Lanes performed as a minister, including standing and walking frequently on carpet, tile, grass, dirt, gravel, snow and ice. Ms. Hunt specifically asked Dr. Blavatsky if it would be medically probable that Lanes' year-long employment as a minister, in which he had to walk on several types of surfaces, could have aggravated his underlying knee condition.

¶8 Dr. Blavatsky responded on June 9, 2006, and stated that in his opinion Lanes had developed arthritic changes in his right knee and that several factors, including age and a rather marked state of deconditioning, had exacerbated his condition. Dr. Blavatsky also

5

acknowledged that Lanes' employment as a minister walking on several types of surfaces following his employment at MSE aggravated his underlying knee condition.

¶9 On June 16, 2006, Lanes filed a petition in the WCC for a hearing on the denial of his claim. Lanes contended he was entitled to temporary total disability (TTD) benefits from the date his total disability benefits were terminated on December 15, 2005, until the date he is determined to be at maximum medical improvement. Further, Lanes contended that he was entitled to permanent total disability (PTD) benefits from the date he is determined to be at maximum medical improvement for his occupational disease because he is unable to work without pain and unable to tolerate that pain in order to perform the duties of regular employment. The State Fund opposed Lanes' petition, arguing that MSE was not the employer of last injurious exposure for Lanes' right knee condition, and that his right knee condition was not caused, either directly or proximately, by his employment at MSE. State Fund further argued that Lanes was not totally disabled due to his left knee condition, and that he was not entitled to additional medical benefits, TTD benefits, or PTD benefits.

¶10 A hearing on Lanes' petition was held before the WCC on November 2, 2006. Through deposition testimony, Dr. Blavatsky opined that Lanes had evolving degenerative conditions in his right knee which began prior to his left knee injury while he was employed with MSE. Importantly, Dr. Blavatsky opined that the aggravation caused to his knees by his job duties as a minister was temporary additional pain which did not permanently aggravate the pre-existing condition.

¶11 The WCC ultimately concluded that Lanes' right knee condition was not proximately caused by his work as a minister, and that his work as a minister did not significantly aggravate or contribute to his right knee condition. Moreover, the WCC concluded that the testimony and medical evidence established that Lanes was last injuriously exposed to the hazard of the occupational disease he developed in his right knee while working for MSE; consequently, the State Fund was liable for the payment of occupational disease benefits to Lane as the insurer of MSE. The WCC further ordered that Lanes was entitled to TTD benefits for his right knee occupational disease. However, the WCC denied Lanes' request for PTD benefits, as well as his requests for costs, attorney's fees, and a statutory penalty under the Workers' Compensation Act, Title 39, chapter 71, MCA.

¶12 State Fund now appeals the WCC's decision, presenting the following issues on appeal:

¶13 **Issue One**: *Did substantial credible evidence support the WCC's factual findings that Lanes' employment as a minister did not significantly aggravate his right knee condition?*

¶14 **Issue Two:** *Did the WCC correctly conclude that a temporary aggravation of a pre-existing right knee condition did not result in an injurious exposure pursuant to § 39-72-303(1), MCA (2003)?*

**STANDARD OF REVIEW**

¶15 We review the WCC's findings of fact to determine whether they are supported by substantial credible evidence and its conclusions of law to determine whether they are

7

correct. *BeVan v. Liberty N.W. Ins. Corp.*, 2007 MT 357, ¶ 8, 340 Mont. 357, ¶ 8, 174 P.3d 518, ¶ 8. Substantial credible evidence is "evidence that a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *S.L.H. v. State Compen. Mut. Ins. Fund*, 2000 MT 362, ¶ 42, 303 Mont. 364, ¶ 42, 15 P.3d 948, ¶ 42 (quotation omitted). When examining conflicting evidence, we consider "whether substantial evidence supports the Workers' Compensation Court, not whether the evidence might support contrary findings." *Caekaert v. State Compen. Mut. Ins. Fund.*, 268 Mont. 105, 110, 885 P.2d 495, 498 (1994).

## DISCUSSION

¶16 **Issue One**: *Did substantial credible evidence support the WCC's factual findings that Lanes' employment as a minister did not significantly aggravate his right knee condition?*

¶17 State Fund argues that the WCC had insufficient credible evidence in this case to conclude that Lanes' employment as a minister caused only a temporary aggravation to his right knee, and that the credible evidence indicates that Lanes' right knee condition arose while he was working as a minister and was significantly aggravated by that employment. State Fund points out that Lanes recovered from his left knee condition and surgery, returned to full employment duty at MSE, and continued to work there without complaint until he accepted the reduction in force buyout. Additionally, State Fund argues that Lanes conceded that he would have continued to work had the reduction in force buyout not been offered. It was not until roughly ten months later that he removed his name from the union list due to the condition of his knees. However, during that

8

time, he worked as a minister. State Fund points out that he admitted under oath that he worked more than fifty-six hours per week at times, and not the thirty hours he originally claimed. Moreover, although Dr. Blavatsky approved the minister position for Lanes, he acknowledged in his letter to Ms. Hunt of the State Fund, that the minister duties aggravated his right knee condition. Additionally, State Fund points out that Dr. Blavatsky did not disapprove of the minister position until May 26, 2006, when Lanes could no longer tolerate the long hours of walking and standing.

¶18 In this connection, State Fund argues that under the WCC decision of *Mont. State Fund v. Murray*, 2004 MTWCC 33,[1] the WCC is required to conclude that State Fund was not liable for Lanes' right knee condition because he was last injuriously exposed to the hazards causing this condition while working as a minister for the Assembly. State Fund further argues that under *Murray* and *Polk v. Planet Ins. Co.*, 287 Mont. 79, 951 P.2d 1015 (1997), the aggravation of a condition need only be "significant," but not the major or most significant factor, in order to be compensable under the Workers' Compensation Act. *See Polk*, 287 Mont. at 85, 951 P.2d at 1018. State Fund further argues that there was no credible evidence that Lanes suffered a significantly symptomatic pre-existing right knee condition during his MSE employment. Instead, State Fund argues that the evidence shows Lanes' right knee condition arose while he was performing his duties as a minister.

¶19 State Fund also argues that the WCC had insufficient credible evidence to conclude that Lanes' minister duties simply caused a "temporary aggravation" to his right

---

[1] We affirmed this decision in the *Murray* Opinion referenced in ¶ 7 of this Opinion.

9

knee, and that the record shows those duties caused a significant aggravation to his right knee. State Fund notes that Lanes worked at times up to fifty-six hours a week and stood on a variety of different surfaces. Additionally, State Fund argues that even if Lanes' right knee injury was a "temporary aggravation," under *Mont. Contractor Compen. Fund v. Liberty N.W. Ins. Co.*, 2003 MTWCC 10, the Assembly took Lanes as it found him and must pay him benefits until he returns to his pre-aggravation condition. Because Dr. Blavatsky did not testify that Lanes ever achieved pre-aggravation status, and Lanes was able to work for approximately ten months as a minister until the pain in his knees was too great, no evidence was presented showing that he returned to pre-aggravation status. Accordingly, State Fund argues the burden is on the Assembly to demonstrate that Lanes returned to pre-aggravation status. State Fund maintains this issue should be remanded in order for the WCC to properly address it.

¶20 Lanes maintains the WCC's findings were supported by substantial credible evidence. Lanes points to Dr. Blavatsky's deposition, where he stated that Lanes had a degenerative condition in his knees before his left knee injury, and that following the injury to his left knee during his employment with MSE, he began overloading the right knee to compensate. While Dr. Blavatsky testified that the ministerial duties did aggravate his right knee, he stated that those aggravations were only temporary, and Lanes' own testimony confirmed this view. Lanes argues that State Fund has presented no evidence to refute the testimony of Dr. Blavatsky and Lanes on this point.

¶21 In reviewing the WCC's decision in this case, our role is not to determine whether there was sufficient evidence to enable the WCC to reach a *different* conclusion; rather,

10

we simply determine whether the conclusion that it did reach is supported by substantial credible evidence. *Caekaert,* 268 Mont. at 110, 885 P.2d at 498. We conclude that it was.

¶22 Here, Dr. Blavatsky's deposition testimony indicated that the right knee condition developed when Lanes began overloading that knee after his left knee was injured. This evidence was confirmed in his testimony at the hearing, and consistent with the testimony given by Lanes himself. Dr. Blavatsky agreed that Lanes' duties as a minister aggravated his right knee, but testified that the aggravation was temporary and that the cause of the right knee condition stemmed from the initial injury to the left knee. State Fund claims that under Montana law, the Assembly maintains liability for the right knee until Lanes returns to pre-aggravation status; however, it provides no authority for this proposition. A review of the *Montana Contractor* case upon which State Fund relies in this regard demonstrates that it is devoid of such authority, contrary to State Fund's assertions.

¶23 Instead, the pertinent authority in the instant case is found in *Burglund v. Liberty Mut. Fire Ins. Co.*, 286 Mont. 134, 950 P.2d 1371 (1997), a case upon which *Montana Contractor* relies. In that case, Burglund sustained a back injury on February 14, 1984, while performing his duties as a package car driver at United Parcel Service (UPS). *Burglund*, 286 Mont. at 135, 950 P.2d at 1371. Burglund had surgery for this condition in 1991, and resumed his position with UPS later that year. His lower back condition worsened and he resigned from the position in 1995.

¶24 Liberty was UPS' insurer. Liberty concluded that Burglund's inability to work was a result of an occupational disease arising subsequent to his 1984 injury, and began

11

paying Burglund TTD benefits. When Burglund reached maximum medical improvement, Liberty begin paying a $10,000.00 award pursuant to § 39-72-405(2), MCA (1993). However, Burglund petitioned the WCC claiming that his condition was a result of the 1984 injury rather than an occupational disease. The WCC found that Burglund's injuries were the result of his 1984 injury, and that Liberty had failed to satisfy its burden of showing that Burglund's condition was not a natural progression of the 1984 injury. Liberty appealed.

¶25 On appeal, we stated that the "crux of Liberty's argument is that Burglund's low-back condition accelerated while performing his duties at UPS between 1991 and 1995 and that the acceleration, rather than the original injury in 1984, caused his current disability." *Burglund*, 286 Mont. at 136, 950 P.2d at 1372. We noted that Burglund had the initial burden of showing by a preponderance that he was entitled to compensation, and met this burden by establishing a clear connection between his current condition and the 1984 injury through the testimony of a physician who testified that the 1984 injury was the material and substantial cause of Burglund's disability. *Burglund*, 286 Mont. at 136, 950 P.2d at 1372.

¶26 Accordingly, "the burden of proof shifted to Liberty to establish that Burglund's degenerative low-back condition was accelerated by a subsequent occupational disease." *Burglund*, 286 Mont. at 136, 950 P.2d at 1372. Specifically, it was incumbent upon Liberty to prove that the "increased disability was not the result of a natural progression of the condition caused by the 1984 injury." *Burglund*, 286 Mont. at 136, 950 P.2d at 1372. We held that Liberty failed to meet its burden. In particular, we noted that the

12

medical testimony substantially supported the WCC's finding that Burglund's condition was caused by the natural progression of the 1984 injury, and that notwithstanding the fact "that Burglund's work from 1991 to 1995 may have hastened the degenerative process that Burglund experienced, [the physician] further testified that such work was not a substantial cause of the degeneration and that Burglund's low-back condition would have deteriorated even if he had not resumed his duties at UPS." *Burglund*, 286 Mont. at 137, 950 P.2d at 1372-73. This is essentially what the deposition of Dr. Blavatsky established. Dr. Blavatsky opined that the original injury to the left knee, combined with Lanes' pre-existing degenerative condition, led him to overload his right knee. According to Dr. Blavatsky's deposition, Lanes' duties as a minister did not permanently aggravate this pre-existing condition. In fact, Dr. Blavatsky opined that the minister duties only constituted a "temporary aggravation" to Lanes' right knee condition. Lanes' own testimony confirmed this view. Under *Burglund*, this was sufficient credible evidence to support the WCC's factual findings that Lanes' employment as a minister did not significantly aggravate his right knee condition. We therefore decline to disturb the WCC's findings in this regard.

¶27   **Issue Two:** *Did the WCC correctly conclude that a temporary aggravation of a pre-existing right knee condition did not result in an injurious exposure pursuant to § 39-72-303(1), MCA (2003)?*

¶28   The WCC concluded that the temporary aggravation of Lanes' knee while performing his job duties as a minister did not constitute the last injurious exposure under the Workers' Compensation Act; therefore, MSE, and not the Assembly, was liable for Lanes' occupational disease. In reaching this conclusion, the WCC relied heavily upon

13

its prior decision in *Romero v. Liberty Mut. Fire Ins. Co.*, 2001 MTWCC 5, *aff'd* 2001 MT 303N, 308 Mont. 394, 43 P.3d 983. In that case, Romero had injured her right shoulder in 1992 while working as a janitor for Commercial Building Maintenance (CBM). *Romero*, ¶ 6. CBM was insured by State Fund which accepted liability for the injury. In December 1994, Romero's treating physician noted that she was having left shoulder problems, which he attributed to her reliance on her left arm due to the fact that she was unable to use her right arm. *Romero*, ¶ 27. He further opined that Romero suffered from low-grade thoracic outlet syndrome, and that her left arm and shoulder complaints were due to her inability to use her right arm. *Romero*, ¶ 33.

¶29 In November 1997, Romero began working part-time in the bakery of County Market in Billings. *Romero*, ¶ 8. She worked at County Market for approximately fifteen weeks, and during that time suffered increased pain in her left arm. *Romero*, ¶ 9. Romero filed an occupational disease claim, asserting that her left arm problems developed while working for County Market. County Market's insurer, Liberty Mutual, denied liability and claimed that the left arm problems were caused by the original injury to the right arm. *Romero*, ¶ 10.

¶30 The issue before the WCC was whether Romero's left arm condition was due to or aggravated by her work at County Market. The WCC concluded that Romero's left arm and right arm conditions were the result of her 1992 industrial accident, and not a result of her work at County Market. *Romero*, ¶ 12. The WCC in *Romero* began its analysis by noting that under the Workers' Compensation Act, an insurer is liable for " 'a subsequent injury . . . if it is the direct and natural result of a compensable primary injury, and not the

14

result of an independent intervening cause.' " *Romero*, ¶ 56 (quoting *Rightnour v. Kare-Mor, Inc.*, 225 Mont. 187, 189, 732 P.2d 829, 831 (1987)). Additionally, the *Romero* WCC cited to *Caekaert* for the proposition that " '[a] later injury is compensable by the original carrier if it is a direct and natural result of a compensable primary injury, and not the result of an independent intervening cause attributable to the claimant.' " *Romero*, ¶ 56 (quoting *Caekaert*, 268 Mont. at 112, 885 P.2d at 499). In examining the medical testimony before it, the *Romero* WCC found that while Romero's work at the County Market made her left arm worse, the testimony also established that any activity requiring her to use her arms would invariably result in further deterioration of the left arm. *Romero*, ¶ 52. The *Romero* WCC found this evidence significant because it indicated that her left arm condition was attributable to the 1992 injury to the right arm for which State Fund was liable, and not her work at County Market. *Romero*, ¶ 63.

¶31 The WCC in the instant case relied upon *Romero* and found it similar to Lanes' situation because Dr. Blavatsky opined that Lanes overloaded his right knee due to the injury to the left knee, and that the activities which he performed as a minister were simply the activities of daily living. As stated by the WCC, "[l]ike Romero, Petitioner had to overuse his other limb to compensate for the injured limb, and therefore, the over use or overloading of the uninjured limb would have caused the development of problems in that limb, regardless of whether he engaged in subsequent employment." Following the rationale of *Romero*, the WCC concluded the evidence before it did not indicate that Lanes' work as a minister significantly aggravated or contributed to his right knee

15

condition, and that the cause of the right knee injury was attributable to the occupational disease he sustained while working for MSE.

¶32 State Fund argues the WCC erred. State Fund maintains that under § 39-72-303(1), MCA (2003), even a temporary aggravation satisfies the definition of "last injurious exposure." This statute reads as follows:

> Where compensation is payable for an occupational disease, the only employer liable is the employer in whose employment the employee was last injuriously exposed to the hazard of the disease.

Section 39-72-303(1), MCA (2003).

¶33 State Fund argues that under the WCC's prior decision in *Fleming v. Intl. Paper Co.*, 2005 MTWCC 34, and *Fleming's* citation to *Larson's Workers' Compensation Law*, any injurious exposure, including an aggravation, is sufficient to satisfy the "last injurious exposure" rule. State Fund quotes *Larson's* for the proposition that " '[a]s long as there was some exposure of a kind that could have caused the disease, the last insurer at risk is liable for all disability from that disease.' " *Fleming*, ¶ 51 (quoting Arthur Larson & Lex Larson, *Larson's Workers' Compensation Law* vol. 9, § 153.02 [7][a], 153-19-20 (2004)). In this regard, State Fund argues that *Romero* is distinguishable because unlike Romero, Lanes' right knee condition was not a prior injury resulting during his employment at MSE, but instead arose many months after that employment ended and was aggravated by his minister duties to the point where he could no longer perform those job duties. State Fund points out that in his testimony Lanes downplayed any

16

outside activities which might have contributed to his right knee condition, meaning that the condition could only have been caused by his work for the Assembly.

¶34    Lanes argues that the WCC did not err because the injurious exposure for his right knee condition occurred during his employment with MSE. Lanes cites to *Caekaert* to argue that State Fund cannot succeed in its argument because the testimony and medical evidence established that Lanes' right knee injury condition was caused by his work at MSE, and not from his work as a minister and, further, that State Fund failed to offer any evidence that Lanes' work as a minister significantly contributed to his right knee condition.

¶35    Under § 39-72-706(1), MCA (2003), an aggravation of a pre-existing condition may give rise to a compensable occupational disease. As noted by the WCC in *Murray*, "[t]he aggravation provision is a reflection of the long standing rule that employers take their workers as they find them, with all their underlying ailments, and that a traumatic event or unusual strain which lights up, accelerates, or aggravates an underlying condition is compensable." *Murray*, ¶ 39 (citing *Birnie v. U.S. Gypsum Co.*, 134 Mont. 39, 45, 328 P.2d 133, 136 (1958)). To determine whether an aggravation of a pre-existing condition gives rise to a compensable occupational disease, "the test for compensability . . . is whether occupational factors significantly aggravated a preexisting condition, not whether occupational factors played the major or most significant role in causing the claimant's resulting disease." *Polk*, 287 Mont. at 85, 951 P.2d at 1018; *accord Murray*, ¶ 22.

¶36    To succeed in its challenge, State Fund must demonstrate that the occupational

17

factors in Lanes' work with the Assembly "significantly aggravated" Lanes' pre-existing condition.  While State Fund argues that *Fleming*'s citation to the *Larson* treatise provides the "general rule of injurious exposure" which controls in this case, that assertion is not supported by the rule expressed in *Polk* which requires a showing of a "significant aggravation."  Moreover, State Fund's reliance on *Fleming* is misplaced.  In that case, Fleming had worked at a lumber mill in Libby, Montana from 1960 to May 1998, and claimed that exposure to asbestos during his employment caused a lung disease.  *Fleming*, ¶ 1.  The mill had been owned by Champion International Corporation from 1960 and November 1993, and by Stimson Lumber Company from November 1993 onward.  *Fleming*, ¶ 1.  At issue in *Fleming* was only whether the asbestos-related lung disease was attributable to Champion or Stimson under the "last injurious exposure rule."  Thus, *Fleming* differed from other cases, such as *Caekaert* and *Murray*, involving "allegations of aggravations suffered on account of second, subsequent occupational diseases or aggravations arising after an earlier injury or a previously diagnosed occupational disease.  In this case, a single disease has been diagnosed and it was diagnosed subsequent to the claimant's retirement." *Fleming*, ¶ 47.  This factual scenario is clearly distinguishable from the case at bar, as here a second aggravation is at issue.

¶37    Irrespective of the applicability of *Romero* to the instant case,[2] State Fund does not provide any authority showing that a "temporary aggravation" is sufficient to establish a

_____

[2] In *Romero* there was direct medical testimony that the claimant's work at the County Market constituted a "significant" aggravation of her pre-existing condition. *Romero*, ¶ 51. Under *Polk*, it is arguable that such testimony could have been sufficient to establish County Market as the employer of the last injurious exposure.

last injurious exposure under § 39-72-303(1), MCA (2003).  Under *Polk*, the aggravation must be "significant" before it will be considered the last injurious exposure.  Dr. Blavatsky's and Lanes' testimony established only that Lanes' ministerial duties constituted a temporary aggravation.  Because the evidence did not establish that the minister duties "significantly aggravated" Lanes' pre-existing condition, the WCC did not err in concluding that this temporary aggravation did not constitute the last injurious exposure under § 39-72-303(1), MCA.  Finally, State Fund provides no authority for the proposition that the burden was on the Assembly to show that Lanes returned to pre-aggravation status in order to escape liability.  Thus, we affirm the WCC's decision.

¶38    Affirmed.


                                                    /S/ PATRICIA COTTER


We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ JIM RICE

19