DA 10-0125

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 279

KIMBERLY M. KELLER,

      Petitioner and Appellant,

    v.

LIBERTY NORTHWEST, INC.,

      Respondent and Appellee.

APPEAL FROM:    Workers' Compensation Court,
                 Cause No. WCC 09-2309
                 Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Howard Toole; Howard Toole Law Offices; Missoula, Montana

      For Appellee:

      Larry W. Jones; Law Offices of Larry W. Jones; Missoula, Montana

Submitted on Briefs:  October 6, 2010

Decided:  December 28, 2010

Filed:

_____
               Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1      Petitioner and Appellant Kimberly Keller appeals from the judgment of the Workers' Compensation (WC) Court, denying her request for rescission of two settlement agreements related to a workplace injury. Keller contends that the settlements were premised on a mutual mistake of fact. The WC Court denied Keller's request to reopen her settlement agreements on the basis that Keller failed to prove that Liberty Northwest (Liberty), her insurer, had no knowledge of the correct diagnosis of her injury at the time the parties entered into the agreements. Keller timely appealed.

¶2      Keller raises the following issues on appeal:

¶3      *1. Whether the WC Court erred in requiring Keller to prove that Liberty had no knowledge that Keller's medical condition included either scapular winging or long thoracic nerve injury at the time the parties entered into settlement agreements.*

¶4      *2. Whether the WC Court properly rejected Keller's request for rescission of her two workers' compensation settlements.*

### FACTUAL AND PROCEDURAL BACKGROUND

¶5      Kimberly Keller began working at A Full Life Agency in 2003. She served as the county coordinator for A Full Life's in-home care services in Superior, Montana. On January 3, 2005, a coworker called in sick, and Keller filled in as an in-home care provider. The client was a large, partially paralyzed woman, and Keller's back was injured when she attempted to break the client's fall. Keller felt a "searing pain" in her neck and back at the time. When the pain failed to abate, Keller saw Jennifer Strine, a physician's assistant in Thompson Falls, Montana.

2

¶6     Strine examined Keller on February 8, and found that Keller had a "thoracic strain and right scapular dysfunction secondary to muscular weakness." Strine informed Keller that she should no longer work due to her injury. Keller saw physical therapist Honani Polequaptewa soon afterwards, who found "acute low back pain" and "right scapular winging." Keller continued to suffer from severe lower back pain, headaches, and tenderness in her upper spine. Strine was called in to Keller's physical therapy appointment on March 4 when Keller experienced muscle spasms and pain in her lower back and buttocks. Strine noted that Keller's scapula had continued to "wing" (i.e., stick out), and diagnosed her with lumbrosacral and gluteal spasm secondary to physical therapy, and scapular winging "most likely due to a long thoracic nerve inflammation or damage."

¶7     Strine referred Keller to Dr. Maurice Brown of Mission Valley Orthopaedic Surgery and Sports Medicine on March 10, 2005. Strine provided her notes to Dr. Brown, including her observance of Keller's right scapular winging. Keller went to Dr. Brown's office on April 6, 2005. At this appointment, Keller was initially examined by Cody Brown (Cody), a physician's assistant working under Dr. Brown. Cody's report listed a number of issues, including chronic headaches, mid and lower back pain, sciatica, right lower extremity paresthesias, and right scapular winging. Cody noted that "excessive winging of the scapula" was present when Keller was asked to lean forward with outstretched arms. Cody reported that his findings were "consistent with nerve entrapment of the cervical spine/thoracic spine, resulting in scapular winging."

3

¶8     Dr. Brown saw Keller on April 27, 2005, after reviewing the results of an MRI he had ordered several days prior.   The MRI revealed four distinct "paracentral disk protrusions" in Keller's spine.   Dr. Brown also noted Keller's raised scapula, observing that "the right scapula and shoulder are intermittently raised in a protective position causing the appearance of scapular winging; however, this was noted to be absent several times during today's evaluation."   In late May, Dr. John Hatheway also saw Keller.   After a physical examination, and review of Keller's MRI results, Hatheway concluded that Keller's back pain was related to one of the disk protrusions detected by the MRI and Dr. Brown.

¶9     Keller saw Dr. Carter Beck in September.   Dr. Beck evaluated Keller and found that she suffered from a "complex pain syndrome," focused in her mid-spinal region. Dr. Beck attributed the pain to problems with Keller's disk protrusions, identifying a specific protrusion as the likely cause of many of Keller's problems.   Dr. Beck recommended that Keller seek out a "comprehensive multidisciplinary pain clinic."   He also stated that Keller was not a candidate for surgery to relieve her symptoms.

¶10    Keller continued to experience severe pain and continued seeking medical attention.   In November 2005, she was evaluated by Dr. Randale Sechrest.   Dr. Sechrest noted that Keller had seen several physicians, including Drs. Brown, Hatheway, and Beck.   Dr. Sechrest reviewed Keller's prior records and exam results, and performed his own physical exam.   He concluded that Keller had a combination of "chronic pain and possible disk pathology" in her thoracic spine.   In June of 2006, Keller again saw Dr. Sechrest, who opined that she had reached maximum medical improvement.   Keller

4

also saw Dr. Patrick Johnson in late 2005, who attributed Keller's pain to both "psychological factors and a medical condition including chronic mid-back pain."

¶11 In August 2006, Keller was evaluated by Dr. John Schumpert. Dr. Schumpert performed an independent medical evaluation (IME) of Keller, and noted that physician's assistant Strine had found right scapular winging, right thoracic strain, and right scapular dysfunction. Dr. Schumpert also noted that Cody Brown had observed right scapular winging in his examination in April 2005, but that no physicians had made the diagnosis. After his own physical evaluation, Dr. Schumpert concluded that although Keller's right scapula was "prominent," he did not observe scapular winging. Instead, Dr. Schumpert diagnosed Keller's raised scapula as a symptom of dextroscoliosis. He noted that Keller had "chronic thoracic region myofascial pain, and chronic right thoracic nonverifiable radicular complaints."[1]

¶12 Keller returned to physician's assistant Strine in September 2006. Strine again found scapular winging, and informed Keller of her findings. Strine noted forward curvature and retraction of Keller's scapula, revealing "significant right scapular winging."

¶13 Keller's pain continued unabated. In late 2006, she retained attorney David Sandler for settlement negotiations. On January 12, 2007, Keller settled her indemnity benefits in the amount of $27,582.64, reserving settlement of medical benefits. She saw Dr. Ray Nelson in March of 2007, who noted Keller's extensive injury history and failure to control her pain despite several cortisone injections in the areas of disk protrusion.

[1] "Radicular" pain is pain which is "radiated" along the sensory distribution of a nerve.

5

Dr. Nelson also noted that several of the medical personnel who had evaluated Keller recommended breast reduction surgery as a possible source of pain relief.

¶14   In August 2007, no longer represented by Sandler, Keller settled her medical benefits for $7,500.00.  The settlement reflected the parties' dispute over whether Keller's proposed breast reduction surgery was a medical necessity.  It was approved in early September by the Department of Labor and Industry.  Keller's pain had still failed to lessen as of the date of this settlement, and she testified that she was still experiencing the same pain symptoms at the time of settlement as she was experiencing at the time of her injury.  Keller underwent breast reduction surgery, but the surgery provided her with no relief of her pain symptoms.

¶15   In August 2008, Keller was referred to Dr. Dean Ross.  Dr. Ross performed an electrodiagnostic test to investigate the cause of Keller's raised scapula, which he described as "striking cosmetically."  The testing produced evidence of a "chronic right long thoracic neuropathy," which caused "profound serratus anterior weakness and scapular winging."  Dr. Ross found "very prominent winging of the right scapula seen at rest and certainly provoked most completely with shoulder abduction and protraction."

¶16   Dr. Ross reviewed physician's assistant Strine's initial treatment notes from 2005, and testified that the scapular winging noted by Strine was "more probably than not" caused by a "long thoracic nerve injury."  He concluded that the symptoms noted in Keller's medical records indicated that Keller's long thoracic nerve injury was present from the date of the initial injury, and had simply been ignored or missed by other treating physicians.  Keller returned to Dr. Beck for another evaluation in October 2008.

6

Dr. Beck studied the results of Dr. Ross's nerve conduction study, and noted that the study verified the diagnosis of "long thoracic nerve palsy." He concluded that Keller's continued pain in her neck and right shoulder was attributable to the nerve palsy, and remarked that he had never seen a patient exhibit such pronounced symptoms from this type of injury.

¶17 Dr. Beck testified that scapular winging is one sign of long thoracic nerve palsy, and that long thoracic nerve radiculopathy (a problem with the long thoracic nerve root) is essentially synonymous with scapular winging. Dr. Beck reconfirmed that he had not identified scapular winging in his initial examination of September 2005, but acknowledged that Dr. Brown's records had included a mention of a raised right scapula giving the appearance of winging, although Dr. Brown had concluded that the winging was not actually present. Dr. Beck opined that the raised scapula in Dr. Brown's 2005 diagnosis was more likely than not the result of Keller's long thoracic neuropathy, which remained undiagnosed until Dr. Ross's 2008 test.

¶18 Keller petitioned the WC Court for reinstatement of her medical benefits and rescission of the two settlement agreements (the indemnity benefits and the medical benefits). Trial was held in October 2009 before the Hon. James J. Shea in Missoula. Keller testified that she was unaware that her condition included right scapular winging or long thoracic nerve injury at the time of settlement. Because the settlement negotiations were premised on mistaken diagnoses, she argued, the settlements were entered into on the basis of a mutual mistake of fact. Given this mutual mistake, Keller contended, the settlements were neither valid nor enforceable, and should be set aside.

7

¶19 The WC Court denied Keller's request for rescission. It concluded that to demonstrate a mutual mistake of fact, Keller had to show that Liberty had no knowledge of Keller's actual injuries (scapular winging and long thoracic neuropathy) at the time of settlement. Although the court found Keller's testimony credible, it ruled that Keller's testimony that she was under a mistaken impression as to the true cause of her injury only showed a *unilateral* mistake of fact, rather than a *mutual* mistake. Concluding that Keller had presented no evidence that Liberty was unaware of Keller's true injury, the court held that she had failed to carry her burden of proof. Having determined that the settlement agreements should not be set aside, the court did not reach the issue of whether Keller's request for rescission was time-barred by the statute of limitations in § 27-2-203, MCA, as was argued by Liberty. Keller timely appealed.

**STANDARD OF REVIEW**

¶20 We review the WC Court's conclusions of law to determine whether they are correct. *Schmill v. Liberty Northwest Ins. Corp.*, 2009 MT 430, ¶ 8, 354 Mont. 88, 223 P.3d 842; *Lanes v. Mont. St. Fund*, 2008 MT 306, ¶ 16, 346 Mont. 10, 192 P.3d 1145. We review the WC Court's findings of fact to determine whether they are supported by substantial credible evidence. *Schmill*, ¶ 8; *Lanes*, ¶ 16; *Van Vleet v. Montana Ass'n of Counties Workers' Comp. Trust*, 2004 MT 367, ¶ 9, 324 Mont. 517, 103 P.3d 544. Substantial credible evidence is "evidence that a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Lanes*, ¶ 16 (citing *S.L.H. v. State Comp. Mut. Ins. Fund*, 2002 MT 362, ¶ 42, 303 Mont. 364, 15 P.3d 948).

8

¶21 If there is conflicting evidence, we consider whether "substantial evidence supports the Workers' Compensation Court, not whether the evidence might support contrary findings." *Schmill*, ¶ 8 (quoting *Caekaert v. State Compen. Mut. Ins. Fund*, 268 Mont. 105, 110, 885 P.2d 495, 498 (1994)). In conducting our review, we do not resolve evidentiary conflicts or consider whether evidence supports factual findings that the WC Court did not make; rather, our inquiry is restricted to "determining whether substantial credible evidence supports the findings *actually made* by the [WC Court]." *Gamble v. Sears*, 2007 MT 131, ¶ 20, 337 Mont. 354, 160 P.3d 537 (emphasis added).

**DISCUSSION**

¶22 Our review today requires us to examine two issues rooted in contract law. We apply contract law to determine whether settlement agreements are valid and enforceable. *Kruzich v. Old Republic Ins. Co.*, 2008 MT 205, ¶ 24, 344 Mont. 126, 188 P.3d 983 (citing *Gamble*, ¶ 24). While Keller seeks "rescission" of her agreements, the doctrine of mutual mistake prevents effective formation of a contract, and so Keller's argument is actually that no contract ever existed. *Gamble*, ¶ 26 n. 4, *Kruzich*, ¶ 24. We have long used the term "rescind" to describe the appropriate remedy in mutual mistake cases, however, and will do so here as well. Keller argues that no contract existed because the parties' consent to the agreement was not effective, as consent cannot be given effectively when based on a mistake. *Kruzich*, ¶ 24.

¶23 Mistakes may be either mistakes of law or mistakes of fact. *Id*. at ¶ 25. Keller contends that the parties entered into the settlement agreements under a mistake of fact,

9

specifically, the nature and extent of her injury. Section 28-2-409, MCA, sets out the applicable definition.

> **28-2-409 What constitutes mistake of fact.** Mistake of fact is a mistake not caused by the neglect of a legal duty on the part of the person making the mistake and consisting in:
> (1) an unconscious ignorance or forgetfulness of a fact, past or present, material to the contract; or
> (2) belief in the present existence of a thing material to the contract which does not exist or in the past existence of such a thing which has not existed.

Thus, parties to a contract can make a mutual mistake if they are "unconsciously ignorant" or "forgetful" of a fact material to the contract. A fact is material when it is a "vital fact upon which the parties based their bargain." *South v. Transportation Ins. Co.*, 275 Mont. 397, 401, 913 P.2d 233, 235 (1996) (internal quotation marks omitted). We have described a mutual mistake regarding a material fact as "so substantial and fundamental" a mistake "as to defeat the object of the parties in making the contract." *South*, 275 Mont. at 401, 913 P.2d at 235 (internal citation and quotation marks omitted). Unsurprisingly, contract law does not uphold agreements which defeat the object of the parties. Consent is not considered effective when the parties' agreement is premised on a mutual mistake, and thus the settlement agreement may be set aside. *Kienas v. Peterson*, 191 Mont. 325, 328-30, 624 P.2d 1, 2-3 (1980); *Weldele v. Medley Dev.*, 227 Mont. 257, 260, 738 P.2d 1281, 1283 (1987); *Kimes v. Charlie's Family Dining & Donut Shop*, 233 Mont. 175, 177, 759 P.2d 986, 988 (1988); *Wolfe v. Webb*, 251 Mont. 217, 223-28, 824 P.2d 240, 244-46 (1992); *South*, 275 Mont. at 401, 913 P.2d at 235.

¶24 Given the subject matter of workers' compensation settlement agreements, the most commonly alleged mutual mistakes predictably relate to mistaken beliefs as to the claimant's injuries. In several prior cases, we have determined that the nature and extent of a claimant's physical condition can constitute a fact that is material to an agreement settling an injury claim. *Kienas*, 191 Mont. at 330, 624 P.2d at 3; *Weldele*, 227 Mont. at 261, 738 P.2d at 1283; *Kimes*, 233 Mont. at 178, 759 P.2d at 988; *Wolfe*, 251 Mont. at 231, 824 P.2d at 248; *Gamble*, ¶ 27; *Kruzich*, ¶ 39.

¶25 In the seminal *Kienas* case, we rescinded a settlement agreement on the basis of mutual mistake as to the claimant's medical condition. The claimant, Kienas, injured his back in a workplace accident. Unbeknownst to the parties at the time, the incident severely aggravated Kienas' existing cerebral palsy (of which the parties were aware). Nine months after the injury, he settled with the State Fund. After settlement, however, Kienas sought to rescind the settlements on the basis of mutual mistake, arguing that the agreements had failed to take into account the aggravation of his cerebral palsy. The WC Court denied his petition, but we reversed on the basis of mutual mistake, concluding that "[n]either party at the time of entering the full and final compromise settlement knew of the exact nature or extent of the injury suffered by claimant." *Kienas*, 191 Mont. at 329, 624 P.2d at 7.

¶26 In *Weldele*, the claimant suffered from shoulder, wrist, and elbow pain. Treating physicians noted the possibility of thoracic outlet syndrome, but ultimately dismissed it as a cause of the claimant's injuries. The agreed-upon diagnosis was carpal tunnel syndrome and rotator cuff syndrome. The parties settled. After settlement, the claimant

11

was, in fact, diagnosed with thoracic outlet syndrome resulting from his on-the-job injury. We upheld a finding of mutual mistake, concluding that the parties "were mistaken" as to the nature of the claimant's injury, which amounted to "an unconscious ignorance of a material fact on the part of both parties upon which the final settlement was based." *Weldele*, 227 Mont. at 261, 738 P.2d at 1283.

¶27 We need not set out our entire catalogue of workers' compensation cases involving mutual mistake here, as we have recently had occasion to do so. *See Kruzich*, ¶¶ 32-38 (discussing *Kienas*, at ¶ 32; *Weldele*, at ¶ 33; *Kimes*, at ¶ 34; *Wolfe*, at ¶ 35-36; *South*, at ¶ 37-38). The rule distilled from these cases is that if parties to a workers' compensation settlement agreement are mutually mistaken as to a material fact concerning the nature and extent of the claimant's injury—as in the case of a misdiagnosis—then the settlement agreement may be set aside. Of course, threshold requirements must still be met, and in *Kruzich*, we rejected a similar claim because the parties were not mistaken as to a fact that existed *at the time of settlement*. *Kruzich*, ¶ 40 (concluding that no mutual mistake existed at the time of settlement because the claimant's Parkinson's disease was not present until ten years after the settlement). Liberty claims that our holding in *Kruzich* precludes Keller's claims. The opinions of Dr. Ross and Dr. Beck, however, make abundantly clear that Keller's scapular winging and long thoracic nerve injury were in existence at the time the parties entered into the settlement agreement, and were caused by Keller's workplace injury. Thus, *Kruzich* does not dispose of Keller's claims.

12

¶28     Liberty also claims that the standard of review set out in *Gamble* prohibits this Court from consideration of the merits of Keller's claims. *Gamble*, as quoted in the standard of review section above, reiterated that we do not disturb the factual findings made by the WC Court, and do not consider whether the evidence might support factual findings not actually made by the WC Court. *Gamble*, ¶ 20. Liberty asserts that Keller's argument can be summarized as offering evidence in rebuttal of factual findings made by the WC Court. This argument is plainly inapposite. Keller disputes conclusions of law made by the WC Court, not findings of fact. The factual findings made by the WC Court concern Keller's injury and treatment history, and are not in dispute. Keller argues that the WC Court erred in its legal conclusions, by using an incorrect legal standard for mutual mistake, and in determining that no mutual mistake existed on that basis.

¶29     We agree with Keller that the WC Court erred in imposing an incorrect burden of proof. The court opined, "[i]n order to find that the alleged material mistake was mutual to both Keller and Liberty, I must find that Liberty had no knowledge that Keller's medical condition included either scapular winging or long thoracic nerve injury at the time the parties entered into the settlement agreements." This is an incorrect statement of the law.

¶30     Both statutory and case law confirm that mutual mistake may still exist when parties know about a theory of injury, if that theory is disregarded, forgotten, or not considered even though raised as a possibility. In *Weldele*, for example, the thoracic outlet syndrome was initially suspected, but was disregarded as a possibility by the consensus of treating physicians. The parties were certainly *aware* of the thoracic outlet

13

syndrome, as it was mentioned repeatedly in the medical records. The parties' knowledge of the disregarded claim was clearly not a dispositive factor. The statutory definition of "mutual mistake" further reveals the inaccuracy of the WC Court's litmus test, as the statute contemplates that parties might be merely "forgetful" of a fact—which assumes, of course, that they *knew of the fact at one time*. Similarly, the statute contemplates that parties might be "unconsciously ignorant," whereas the WC Court's test seems to require that the parties be *entirely* ignorant, not just unconsciously so. The test for mutual mistake is an inquiry into whether the parties considered or relied on a fact in making their bargain, not a mere chronological examination into whether parties knew of a fact prior to entering into the agreement. Put simply, the parties' reliance on a misdiagnosis can suffice.

¶31    Here, even if the parties were mutually aware of the contents of Keller's medical records, which contain references to scapular winging and at least some nerve-related complaints in the thoracic region, it is entirely possible that they entered into the settlement agreements under a mistaken impression as to the nature and extent of Keller's injuries. In *Kienas*, we examined the factual findings made by the WC Court and reversed the lower court, concluding that the findings conclusively demonstrated that a mutual mistake had occurred.[2] Here, however, the WC Court halted its analysis before making the necessary findings to support such a claim.

---

[2] Whether a mutual mistake exists seems to be at least partially a question of fact, properly resolved only by the trial court, unless the trial court's record contains all the necessary factual findings to support a conclusion by an appellate court which does not engage in fact-finding. In *Wolfe*, 251 Mont. at 231, 824 P.2d at 248, for example, we referred to the WC Court's "finding"

14

¶32     Our standard of review does not permit us to engage in the necessary fact-finding on which to base a conclusion of mutual mistake. "We do not resolve conflicts in the evidence, and we do not consider whether evidence supports findings that are different than those made by the WC Court; rather, we confine our review to determining whether substantial credible evidence supports the findings *actually made* by the WC Court." *Gamble*, ¶ 20 (emphasis added). Although there was undoubtedly a misdiagnosis of some degree in Keller's case, this Court is not the proper forum to settle the factual inquiry as to what were the "vital facts" on which the parties based their settlement agreements. Thus, we must remand this case back to the WC Court, so that court can make the necessary factual findings, and can apply the correct standard for mutual mistake to these findings.

¶33     The WC Court also did not reach the question of whether the alleged mutual mistake as to the nature and extent of Keller's injuries constituted a *material* fact. As we have observed above, the "exact nature and extent of the injury suffered" can certainly be a fact material to the contract. *Kienas*, 191 Mont. at 329, 624 P.2d at 7. This is not *necessarily* the case, however, and we conclude that whether the mistake was material is a determination properly made by the trial court. It is difficult, from this Court's vantage point, to evaluate the dissimilarities, or lack thereof, between the different diagnoses of Keller's medical condition. It is conceivable that the fact that the parties relied on Keller's incorrectly diagnosed injuries rather than her correctly diagnosed injuries would

---

as to mutual mistake, suggesting that we considered the question of whether a mutual mistake existed to be a question of fact.

15

not rise to the level of a material fact, were the treatment, prognosis, and symptoms of the injuries identical.

¶34 In *Sollie v. Peavey Co.*, 212 Mont. 197, 686 P.2d 920 (1984), for example, the claimant (Sollie) injured his back while attempting to raise an overhead door at a grain elevator. He was diagnosed with a degenerative lumbar disc disease and a defect in his lowest lumbar vertebrae, and was assigned a permanent partial impairment rating of 20%. After settlement, Sollie sought rescission of the settlement agreements. Basing his argument on similarity to the facts in *Kienas*, he contended that the treating physicians had failed to take into account aggravation of his preexisting disc disease caused by the accident, just as the parties in *Kienas* had failed to take into account aggravation of the claimant's preexisting cerebral palsy. Because there was no substantial difference between Sollie's diagnosis, treatment options, and impairment levels, however, no mutual mistake of material fact was found, and the parties were held to have effectively consented to the agreements. *Id*. at 204, 686 P.2d at 924. In the instant case, it is conceivable that the parties may not have specifically considered long thoracic nerve injury or scapular winging in entering into the settlement agreements, but nonetheless had a sufficiently clear picture of the treatment, prognosis, and likely symptoms of Keller's injury. The misdiagnosis might thus be rendered immaterial. The WC Court must be afforded the opportunity to consider these questions.

¶35 We need not consider any further arguments of the parties. We leave determination of any outstanding issues, such as Liberty's statute of limitations argument, to the judgment of the WC Court. We conclude that the question of whether the statute

16

of limitations bars Keller's claim is a triable issue and will allow the WC Court to evaluate this claim on its merits.

¶36    We conclude that the WC Court erred by applying an incorrect burden of proof. Reversed and remanded for further proceedings in accordance with this opinion.


/S/ W. WILLIAM LEAPHART


We concur:


/S/ MIKE McGRATH
/S/ JIM RICE
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON